# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

ODULIA ASHBY AND KEVIN ASHBY, on behalf of themselves and on behalf of their minor child, N.A., and on behalf of all others similarly situated; VON MARIE RIVERA, on behalf of herself and on behalf of her minor child, F.A.D.R., and on behalf of all others similarly situated; CAITLYN BESSER, on behalf of herself and on behalf of her minor children, S.B. and V.B., and on behalf of all others similarly situated; MARISSA GOTTLIEB, on behalf of herself and on behalf of her minor children, H.G., L.G., and B.G., and on behalf of all others similarly situated; KASEY MALONE, on behalf of herself and on behalf of her minor child, E.M., and on behalf of all others similarly situated; VERONICA MCKAY, on behalf of herself and on behalf of her minor child, A.M., and on behalf of all others similarly situated; BRIANA PASCUAL-CLEMENT, on behalf of herself and on behalf of her minor children, A.P., E.I.P., N.P., and E.L.P., and on behalf of all others similarly situated; NALLELY SAUCEDA, on behalf of herself and on behalf of her minor child, M.S., and on behalf of all others similarly situated; EMILY BIRTWISTLE, on behalf of herself and on behalf of her minor child, D.B.; MATTHEW FOSTER, on behalf of himself and on behalf of his two minor children, J.F. and A.F.; WHITNEY KELTCH GREEN, on behalf of herself and on behalf of her minor child, Z.G.; HELEN HANKS AND MADISON HANKS, on behalf of themselves and on behalf of their minor child, O.H.; KENNETH HAYES, on behalf of himself and on behalf of his minor children, D.H. and S.H.; ANDREW KIRK, on behalf of himself and on behalf of his minor child, J.K.; ANN-MARIE LELEK, on behalf of herself and on behalf of her minor children, B.L. and A.L.; JOYCE MASTERS, on behalf of herself and on behalf of her minor child, J.M.; RANDY MYERS, on behalf of himself and on behalf of his minor children, Q.M. and M.M.; and JESSICA SALYERS AND JOSHUA SALYERS, on behalf of themselves and on behalf of their minor child, M.S.,

     Plaintiffs,

       v.

CIVIL ACTION NO.

 5:25-cv-01613

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

SCHERTZ-CIBOLO-UNIVERSAL CITY
INDEPENDENT SCHOOL DISTRICT, on behalf of itself
and a class of all Texas independent school districts
similarly situated; MEDINA VALLEY INDEPENDENT
SCHOOL DISTRICT, on behalf of itself and a class of all
Texas independent school districts similarly situated;
HURST-EULESS-BEDFORD INDEPENDENT SCHOOL
DISTRICT, on behalf of itself and a class of all Texas
independent school districts similarly situated; CARROLL
INDEPENDENT SCHOOL DISTRICT, on behalf of itself
and a class of all Texas independent school districts
similarly situated; KATY INDEPENDENT SCHOOL
DISTRICT, on behalf of itself and a class of all Texas
independent school districts similarly situated; WYLIE
INDEPENDENT SCHOOL DISTRICT, on behalf of itself
and a class of all Texas independent school districts
similarly situated; PROSPER INDEPENDENT SCHOOL
DISTRICT, on behalf of itself and a class of all Texas
independent school districts similarly situated; DEER
PARK INDEPENDENT SCHOOL DISTRICT, on behalf of
itself and a class of all Texas independent school districts
similarly situated; ARGYLE INDEPENDENT SCHOOL
DISTRICT; MAGNOLIA INDEPENDENT SCHOOL
DISTRICT; RICHARDSON INDEPENDENT SCHOOL
DISTRICT; CLEAR CREEK INDEPENDENT SCHOOL
DISTRICT; FORT SAM HOUSTON INDEPENDENT
SCHOOL DISTRICT; LIBERTY HILL INDEPENDENT
SCHOOL DISTRICT; PEARLAND INDEPENDENT
SCHOOL DISTRICT; and BIRDVILLE INDEPENDENT
SCHOOL DISTRICT,

     Defendants.

## **COMPLAINT**

1.      Consistent with Texas law requiring parents to send their minor children to school,

upwards of 5.5 million students are enrolled in more than 9,000 public elementary and secondary

schools across the state. These children and their families adhere to an array of faiths, and many

do not practice any religion at all. Nevertheless, because of Senate Bill No. 10 ("S.B. 10" or "the

Act"), which requires public schools to post a state-approved, Protestant version of the Ten Commandments in a "conspicuous place" in every classroom, all of these students will be forcibly subjected to scriptural dictates, day in and day out, including: "I AM the LORD thy God"; "Thou shalt have no other gods before me"; "Thou shalt not make to thyself any graven images"; "Thou shalt not take the Name of the Lord thy God in vain"; "Remember the Sabbath day, to keep it holy"; and "Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee." This simply cannot be reconciled with the fundamental principles of religious freedom that animated the Founding of our nation.

2.      These Founding principles are reflected in a long line of Supreme Court jurisprudence that prohibits public schools from imposing religious doctrine and practice on students. Indeed, for nearly half a century, it has been well settled that the First Amendment forbids public schools from permanently posting the Ten Commandments in this manner. In *Stone v. Graham*, 449 U.S. 39, 42 (1980), the Supreme Court struck down a Kentucky law mandating classroom displays of the Ten Commandments, holding that such displays would unconstitutionally "induce [ ] schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments."

3.      On August 20, 2025, a court in this district ruled that S.B. 10 is "plainly unconstitutional" and likely violates the Establishment and Free Exercise Clauses of the First Amendment. *See Nathan v. Alamo Heights Indep. Sch. Dist.*, No. 25-cv-00756, 2025 WL 2417589, at *23 (W.D. Tex. Aug. 20, 2025), *hearing en banc ordered*, No. 25-50695, 2025 WL 3018244 (5th Cir. Oct. 28, 2025) (cleaned up). The decision in *Nathan* reflects binding Supreme Court precedent: *Stone*, 449 U.S. 39; *Lee v. Weisman*, 505 U.S. 577 (1992); *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022); and most recently, *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025). On

November 18, 2025, relying on *Stone*, a second court in this district also ruled that S.B. 10 violates the First Amendment. *See* Order, *Cribbs Ringer v. Comal Indep. Sch. Dist.*, No. 25-cv-01181, ECF No. 68 at 10-11 (W.D. Tex. Nov. 18, 2025).

4.      Despite these precedents, the Defendant School Districts—who are named as representatives of the putative Defendant Class (as defined below)—have pressed forward with actually posting S.B. 10 displays in classrooms. They have done so even after many of these Defendant School Districts received a letter from plaintiffs' counsel in *Nathan* notifying them of the *Nathan* court's ruling and warning them that *all* school districts have an independent legal obligation to comply with the ruling and avoid violating children's and parents' First Amendment rights.

5.      As *Nathan* and *Cribbs Ringer* have made clear: Permanently posting the Ten Commandments in every public-school classroom—rendering them unavoidable—will violate the constitutional rights of minor children attending Texas elementary and secondary schools. The displays will pressure Texas public school students into religious observance, veneration, and adoption of the state's favored religious scripture. The displays will also send the harmful and religiously divisive message that students who do not subscribe to the Ten Commandments—or, more precisely, to the specific version of the Ten Commandments that S.B. 10 requires—are disfavored members of their own school community, pressuring them to refrain from expressing any faith practices or beliefs that are not aligned with the state's religious preferences. And the displays will substantially interfere with and burden the rights of the parent-Plaintiffs, who are Christian, Jewish, Unitarian Universalist, spiritual, agnostic, atheist, and nonreligious, to direct their children's education and upbringing when it comes to religious matters.

6.      The state's main interest in displaying the Ten Commandments in public schools under S.B. 10 is to impose specific religious beliefs on public-school children, ignoring the numerous objections from Texas families and faith leaders from across the religious spectrum. As Lieutenant Governor Dan Patrick, who presides over the Texas Senate, put it: Because of S.B. 10, students "in every classroom in Texas. . . are going to see the Ten Commandments[] and they are going to know about God." Sen. Phil King, S.B. 10's lead Senate sponsor and author, echoed the sentiment, explaining: "[W]e want every kid, [pre-k] through twelve, every day, in every classroom they sit in to look on the wall and read . . . those words that [] God says because we want them to understand how important that those statements of God, those rules of God are that they see them in their classroom every single day of their public education."

7.      For these reasons, Plaintiffs, on behalf of themselves and other similarly situated parents and minor children, seek a declaratory judgment that S.B. 10 is unconstitutional. Plaintiffs also seek a temporary restraining order and preliminary injunction, as well as permanent injunctive relief, to prevent Defendants and other independent school districts similarly situated from complying with the Act.

## JURISDICTION & VENUE

8.      Plaintiffs bring this matter under 42 U.S.C. § 1983, for violations of civil rights under the First and Fourteenth Amendments to the U.S. Constitution. Because this action arises under the U.S. Constitution and the laws of the United States, it presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331. In addition, this Court has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3).

9.      The Court is authorized to award the declaratory and injunctive relief requested by Plaintiffs pursuant to 28 U.S.C. §§ 2201 and 2202.

10.     Pursuant to 28 U.S.C. § 1391, venue is proper in the Western District of Texas. Plaintiffs Odulia Ashby, Kevin Ashby, Von Marie Rivera, Kenneth Hayes, Andrew Kirk, Ann-Marie Lelek, and Joyce Masters reside in this district, and their minor-children Plaintiffs attend public schools in this district.

11.     All Defendants are located within the state of Texas. Defendants Schertz-Cibolo-Universal City Independent School District, Medina Valley Independent School District, Fort Sam Houston Independent School District, and Liberty Hill Independent School District are located within this district. Accordingly, the actions to comply with S.B. 10 by the Defendants that give rise to the claims herein are occurring and will necessarily continue to occur in large part within this district.

## **PARTIES**

12.     Plaintiffs Odulia Ashby and Kevin Ashby bring this suit on behalf of themselves and on behalf of their minor child, N.A., and on behalf of all others similarly situated. The family is domiciled in Guadalupe County, Texas. N.A. is enrolled in and attends a public high school in the Schertz-Cibolo-Universal City Independent School District for the 2025-2026 school year.

13.     Plaintiff Von Marie Rivera brings this suit on behalf of herself and on behalf of her minor child, F.A.D.R., and on behalf of all others similarly situated. The family is domiciled in Bexar County, Texas. F.A.D.R. is enrolled in and attends a public middle school in the Medina Valley Independent School District for the 2025-2026 school year.

14.     Plaintiff Caitlyn Besser brings this suit on behalf of herself and on behalf of her minor children, S.B. and V.B., and on behalf of all others similarly situated. The family is domiciled in Tarrant County, Texas. S.B. and V.B. are enrolled in and attend a public elementary school in the Hurst-Euless-Bedford Independent School District for the 2025-2026 school year.

15.     Plaintiff Marissa Gottlieb brings this suit on behalf of herself and on behalf of her minor children, B.G., L.G., and H.G., and on behalf of all others similarly situated. The family is domiciled in Tarrant County, Texas. B.G., L.G., and H.G. are enrolled in and attend a public preschool, a public elementary school, and a public middle school, respectively, in the Carroll Independent School District for the 2025-2026 school year.

16.     Plaintiff Kasey Malone brings this suit on behalf of herself and on behalf of her minor child, E.M., and on behalf of all others similarly situated. The family is domiciled in Fort Bend County, Texas. E.M. is enrolled in and attends a public high school in the Katy Independent School District for the 2025-2026 school year.

17.     Plaintiff Veronica McKay brings this suit on behalf of herself and on behalf of her minor child, A.M., and on behalf of all others similarly situated. The family is domiciled in Collin County, Texas. A.M. is enrolled in and attends a public middle school in the Wylie Independent School District for the 2025-2026 school year.

18.     Plaintiff Briana Pascual-Clement brings this suit on behalf of herself and on behalf of her minor children, A.P., E.I.P., N.P., and E.L.P., and on behalf of all others similarly situated. The family is domiciled in Collins County, Texas. N.P. and E.L.P. are enrolled in and attend a public elementary school in the Prosper Independent School District for the 2025-2026 school year. A.P. and E.I.P. are enrolled in and attend a public high school in the Prosper Independent School District for the 2025-2026 school year.

19.     Plaintiff Nallely Sauceda brings this suit on behalf of herself and on behalf of her minor child, M.S., and on behalf of all others similarly situated. The family is domiciled in Harris County, Texas. M.S. is enrolled in and attends a public elementary school in the Deer Park Independent School District for the 2025-2026 school year.

20.     Plaintiff Emily Birtwistle brings this suit on behalf of herself and on behalf of her minor child, D.B. The family is domiciled in Denton County, Texas. D.B. is enrolled in and attends a public elementary school in the Argyle Independent School District for the 2025-2026 school year.

21.     Plaintiff Matthew Foster brings this suit on behalf of himself and on behalf of his minor children, J.F. and A.F. The family is domiciled in Montgomery County, Texas. J.F. and A.F. are enrolled in and attend a public junior high school and a public intermediate school, respectively, in the Magnolia Independent School District for the 2025-2026 school year.

22.     Plaintiff Whitney Keltch Green brings this suit on behalf of herself and on behalf of her minor child, Z.G. The family is domiciled in Dallas County, Texas. Z.G. is enrolled in and attends a public elementary school in the Richardson Independent School District for the 2025-2026 school year.

23.     Plaintiffs Helen Hanks and Madison Hanks bring this suit on behalf of themselves and on behalf of their minor child, O.H. The family is domiciled in Harris County, Texas. O.H. is enrolled in and attends a public high school in the Clear Creek Independent School District for the 2025-2026 school year.

24.     Plaintiff Kenneth Hayes brings this suit on behalf of himself and on behalf of his minor children, D.H. and S.H. The family is domiciled in Bexar County, Texas. D.H. and S.H. are enrolled in and attend public schools in the Fort Sam Houston Independent School District for the 2025-2026 school year.

25.     Plaintiff Andrew Kirk brings this suit on behalf of himself and on behalf of his minor child, J.K. The family is domiciled in Williamson County, Texas. J.K. is enrolled in and

attends a public elementary school in the Liberty Hill Independent School District for the 2025-2026 school year.

26.    Plaintiff Ann-Marie Lelek brings this suit on behalf of herself and on behalf of her minor children, B.L. and A.L. The family is domiciled in Guadalupe County, Texas. B.L. and A.L. are enrolled in and attend a public elementary school and a public intermediate school, respectively, in the Schertz-Cibolo-Universal City Independent School District for the 2025-2026 school year.

27.    Plaintiff Joyce Masters brings this suit on behalf of herself and on behalf of her minor child, J.M. The family is domiciled in Guadalupe County, Texas. J.M. is enrolled in and attends a public junior high school in the Schertz-Cibolo-Universal City Independent School District for the 2025-2026 school year.

28.    Plaintiff Randy Myers brings this suit on behalf of himself and on behalf of his minor children, Q.M. and M.M. The family is domiciled in Brazoria County, Texas. Q.M. and M.M. are enrolled in and attend a public elementary school in the Pearland Independent School District for the 2025-2026 school year.

29.    Plaintiffs Jessica Salyers and Joshua Salyers bring this suit on behalf of themselves and on behalf of their minor child, M.S. The family is domiciled in Tarrant County, Texas. M.S. is enrolled in and attends a public elementary school in the Birdville Independent School District for the 2025-2026 school year.

30.    The Defendant School Districts include the following independent school districts in the State of Texas, all of which are required to post Ten Commandments displays compliant with S.B. 10 and abide by this requirement: Schertz-Cibolo-Universal City Independent School District, Medina Valley Independent School District, Hurst-Euless-Bedford Independent School

District, Carroll Independent School District, Katy Independent School District, Wylie Independent School District, Prosper Independent School District, Deer Park Independent School District, Argyle Independent School District, Magnolia Independent School District, Richardson Independent School District, Clear Creek Independent School District, Fort Sam Houston Independent School District, Liberty Hill Independent School District, Pearland Independent School District, and Birdville Independent School District.

## **FACTUAL ALLEGATIONS**

31.     On June 20, 2025, Texas Governor Greg Abbott signed into law S.B. 10, which provides that every public elementary and secondary school in the state "shall display in a conspicuous place in each classroom of the school a durable poster or framed copy of the Ten Commandments[.]" The Act took effect on September 1, 2025.

32.     Under the Act, the poster or framed copy "must . . . include only the text of the Ten Commandments as provided by Subsection (c)," which states:

The Ten Commandments

I AM the LORD thy God.

Thou shalt have no other gods before me.

Thou shalt not make to thyself any graven images.

Thou shalt not take the Name of the Lord thy God in vain.

Remember the Sabbath day, to keep it holy.

Honor thy father and thy mother, that thy days may be long upon the
land which the Lord thy God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

Thou shalt not bear false witness against thy neighbor.

Thou shalt not covet thy neighbor's house.

Thou shalt not covet thy neighbor's wife, nor his manservant, nor
his maidservant, nor his cattle, nor anything that is thy
neighbor's.

33.     As alleged further below, *infra* ¶¶ 42-54, this version of the Ten Commandments is associated with certain Protestant faiths and conflicts with the version of the Ten Commandments followed by many Jews and Catholics.

34.     The Act further requires that each poster or copy of the Ten Commandments "be at least" sixteen inches by twenty inches in size and that the text of the Ten Commandments be printed "in a size and typeface that is legible to a person with average vision from anywhere in the classroom[.]"

35.     Under the Act, the required displays will be donated to schools. A school lacking compliant displays in each classroom also "may, but is not required to, purchase posters or copies . . . using district funds."

36.     The displays will be permanent and year-round; the Act does not provide for a time limit on the displays.

37.     The Act requires that the displays of the Ten Commandments be posted in all classrooms. There are no exceptions. The Act states: "Notwithstanding any other law, a public elementary or secondary school is not exempt from this section."

38.     The Act requires the displays to be placed in every classroom, regardless of the subject matter taught therein. For example, the Act requires the state-approved version of the Ten Commandments to be posted in math and science classrooms. Thus, all students, including those who move classrooms during the school day and those who stay in the same classroom for much

of the school day, will be subjected to the displays at all times they are in class, no matter the topic of the instruction at hand.

39.    The Kentucky Ten Commandments statute struck down in *Stone* required an accompanying context statement that purported to explain the historical relevance and use of the Ten Commandments. S.B. 10 does not include such a provision.

40.    In any event, and contrary to the state's assertions, this nation's core Founding documents—the Declaration of Independence, the United States Constitution, and the Bill of Rights—were not based on the Ten Commandments, and there is no longstanding history or tradition of prominently and permanently displaying the Ten Commandments in public-school classrooms.

41.    As evinced by the Act's minimum requirements for the classroom displays and comments made by various lawmakers, *see infra* ¶¶ 69-78, the state's main interest in enacting S.B. 10 is the imposition of religious beliefs and tenets on public-school children.

**The Act Officially Approves and Prescribes One Particular Version of the Ten Commandments, to Which Many People Do Not Subscribe.**

42.    S.B. 10 is not neutral with respect to religion. On its face, it expressly requires the display of religious scripture—the Ten Commandments—in every public-school classroom. It also requires that schools post a specific, state-approved version of that scripture that is associated with certain Protestant faiths, weighing in on theological questions regarding the correct content and meaning of the Ten Commandments and enshrining in state law an official denominational preference. Thus, the *Nathan* court correctly held that S.B. 10 "impermissibly takes sides on

theological questions and officially favors Christian denominations over others." 2025 WL 2417589, at *27.

43.     Numerous Texans do not subscribe to the specific text of the Ten Commandments that is mandated by S.B. 10.

44.     Many people in Texas are nonreligious and do not adhere to the religious tenets set forth in any version of the Ten Commandments, including the one mandated by S.B. 10.

45.     There are many faith traditions that do not teach, recognize, or reference the Ten Commandments at all. For example, followers of Hinduism, Buddhism, Sikhism, and Taoism generally do not consider the Ten Commandments to be part of their belief system, and certain Commandments directly conflict with the tenets of some of these religions.

46.     Some Christians, including Jehovah's Witnesses, reject the proposition that the Ten Commandments are authoritative or binding.

47.     Some faith traditions, including some Christian denominations, consider the Ten Commandments to be part of their theology and authoritative but do not believe in elevating the Commandments set forth in S.B. 10 over other biblical teachings.

48.     Even for faith traditions that view the Ten Commandments as authoritative and important, there are many different versions of the Ten Commandments that vary based on religious denomination and biblical translation.

49.     Among those who may believe in some version of the Ten Commandments, the particular text they follow can differ by religious denomination or tradition. For instance, Catholics, Jews, and many Protestants differ in the way that they number, organize, and translate the Ten Commandments from Hebrew to English.

50.     The text of the Ten Commandments mandated by S.B. 10 is a Protestant version.

51.    The version of the Ten Commandments mandated by the Act does not match versions or translations found in the Jewish tradition.

52.    The version of the Ten Commandments mandated by S.B. 10 omits key language and context that is included in the version set forth in the Torah. For example, it is missing the important message in the Jewish story about God bringing the Israelites out of Egyptian slavery to freedom. It also states "[t]hou shalt not kill," whereas the translated version followed by most Jews prohibits "murder." The different language reflects deep theological differences as to the Ten Commandments' meaning and scope.

53.    The version of the Ten Commandments mandated by S.B. 10 does not match the version followed by most Catholics. For example, the Catholic version of the Ten Commandments, when abridged, typically does not include the language prohibiting "graven images." Indeed, given how common iconography, sculpture, and other artwork are in the Catholic faith, this prohibition conflicts with how many Catholics practice their faith on a day-to-day basis.

54.    Although the version of the Ten Commandments mandated by S.B. 10 is Protestant and is drawn from the King James Bible, the specific text and wording of the Ten Commandments required under S.B. 10 are religiously objectionable even to some adherents of certain Protestant denominations.

**The Displays Mandated by S.B. 10 Will Coerce Students, Including the Minor-Child Plaintiffs, into Religious Observance, Veneration, and Adoption of the State's Official Religious Scripture.**

55.    Under Texas law, minor children are required to "attend school each school day for the entire period" that instructional programming is provided. Tex. Educ. Code § 25.085(a).

56.    When a student exceeds the number of allowable unexcused absences from school, students and parents may be subject to educational and legal penalties, including civil prosecution

in court. *See* Tex. Fam. Code § 65.003(b); Tex. Educ. Code § 25.093(a). Other possible penalties include a "behavior improvement plan," "school-based community service," or a referral to "counseling, mediation, mentoring, a teen court program, community-based services, or other in-school or out-of-school services aimed at addressing the student's truancy." Tex. Educ. Code § 25.0915(a-1)(1)–(2).

57.    Further, if a school issues the required attendance warning and the parent, acting with criminal negligence, "fails to require the child to attend school as required by law, and the child has [excessive unexcused] absences . . . the parent commits an offense." *Id.* § 25.093(a). "The attendance officer or other appropriate school official *shall* file a complaint against the parent" in the appropriate court. *Id.* § 25.093(b) (emphasis added).

58.    The offense is classified as a misdemeanor punishable by a fine not to exceed $100 "for a first offense," and up to $500 for a "fifth or subsequent offense." *Id.* § 25.093(c). "Each day the child remains out of school may constitute a separate offense." *Id.* § 25.093(c-1). The court also "may order the defendant to attend a program for parents of students with unexcused absences that provides instruction designed to assist those parents in identifying problems that contribute to the students' unexcused absences[.]" *Id.* § 25.093(f). If "a parent refuses to obey a court order . . . the court may punish the parent for contempt of court[.]" *Id.* § 25.093(g) (citing Tex. Gov't Code § 21.002, which authorizes a fine or confinement in jail for contempt of court).

59.    Consistent with Texas's compulsory education law, more than 5.5 million children are enrolled in more than 9,000 public schools across the state.[1]

---

[1]    *See    2024-2025    Student    Enrollment*, Tex. Educ. Agency, https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=marykay&_program=adhoc.addispatch.sas &major=st&minor=e&charsln=120&linespg=60&loop=1&countykey=&oldnew=new&_debug= 0&endyear=25&selsumm=ss&key=TYPE+HERE&grouping=e+&format=W (last visited Nov. 23, 2025); *Tex. Pub. Sch. Explorer*, Tex. Tribune (Apr. 2025), https://schools.texastribune.org.

60.     These children and their families represent a wide array of faiths. And within these faith systems, students and families adhere to a variety of denominations, branches, and sects.

61.     Many public-school children and families in Texas, including some of the Plaintiffs, do not adhere to any faith and cherish their rights to be nonreligious to the same extent that people of faith cherish their rights to religious belief and exercise. *See infra ¶¶* 104-116, 133-140, 149-168, 183-188, 196-209, 219-233.

62.     Given the religious diversity present in Texas's public schools, many students and families, including some of the Plaintiffs, do not subscribe to any version of the Ten Commandments. *See infra ¶¶* 105, 110, 118, 126, 134, 142, 163, 170, 185, 190, 197, 204, 211, 220.

63.     Many other public-school students and their families who believe in a version of the Ten Commandments, including some of the Plaintiffs, do not subscribe to the specific state-selected version set forth in S.B. 10 and/or believe that the imposition of this scripture outside of the context of their faith, as mandated by S.B. 10, conflicts with core religious tenets. *See infra ¶¶* 126, 174.

64.     Under the Act, all of these students will be forcibly subjected to the state's official version of the Ten Commandments for nearly every hour that they are in school.

65.     Texas public schools must operate for at least 75,600 minutes (an equivalent of 1,260 hours) each school year, "including time allocated for instruction, intermissions, and recesses for students." Tex. Educ. Code § 25.081(a). Thus, for students entering the Texas public-school system in kindergarten, S.B. 10 will subject them to the state's preferred religious dogma for up to 16,380 hours across thirteen academic years.

66.    In addition, multiple Defendant School Districts hold various inter-school events and activities throughout the school year during which children, including many of the minor-child Plaintiffs, visit a district school other than their own.

67.    Moreover, many Defendant School Districts hold cross-district events and activities throughout the school year during which children, including many of the minor-child Plaintiffs, visit a school district other than their own.

68.    As alleged above, the Act requires that public schools display the Ten Commandments in "a conspicuous place" in every classroom—with no exceptions. The poster or framed copy may include "only the text of the Ten Commandments as provided" in S.B. 10 and must be at least sixteen inches by twenty inches in size. Further, the text of the Ten Commandments must be printed "in a size and typeface that is legible to a person with average vision from anywhere in the classroom[.]"

69.    These minimum requirements of the Act are designed to, and will, ensure that students cannot avoid S.B. 10's displays and are thus more likely to observe, absorb, accept, follow, and live by the religious directives in the Ten Commandments. For example, Lt. Gov. Dan Patrick touted S.B. 10 by boasting that, "in every classroom in Texas, [students] are going to see the Ten Commandments, and they are going to know about God."[2]

70.    Sen. Phil King, S.B. 10's lead Senate sponsor and author, similarly stated, "[W]e want every kid, [pre-K] through twelve, every day, in every classroom they sit in to look on the wall and read . . . those words [] that God says because we want them to understand how important

---

[2] *Washington Watch with Tony Perkins*, Tony Perkins, at 11:05–11:10 (May 27, 2025), https://www.tonyperkins.com/get.cfm?i=LR25E20#gsc.tab=0.

that those statements of God, those rules of God are that they see them in their classroom every single day of their public education."[3]

71.     And, responding to another lawmaker's suggestion that "the members of the legislature should focus more on trying to follow the Ten Commandments rather than telling others to follow them," Rep. Candy Noble, the lead House sponsor and author of S.B. 10, proclaimed during the legislative debates that "it is incumbent on all of us to follow God's law, and I think that we would be better off if we did."[4] Asked whether "our public schools are missing God's law," she responded, "[i]n some instances, yeah," but went on to praise "some amazing teachers out there that are showing an awful lot of Christian behavior and love and concern to their students."[5]

72.     Other lawmakers have likewise made clear the intended religious impact of S.B. 10. Thanking Rep. Noble for introducing the bill, Rep. Harold Dutton, Jr. announced during the floor debate, "I appreciate her bringing this to us because I think, again, to teach our children to better their behavior and that there is something in all of us that God has placed in each and every one of us. And the only way to get that out is to follow His commands. And His commands, the Ten Commandments set that out. And the best way to teach children is to find a means in which they are willing to learn."[6]

---

[3] Kimberly Watts, *king audio 20250618toddstarnes*, YouTube, at 3:40–4:14 (June 21, 2025), https://www.youtube.com/watch?v=Kbll35APGTs (video directly linked from Sen. King's official website in *Action on Iran; New Laws for Securing Borders, Texas Land, Our Citizens and Elections*, https://www.philking.com/2025/06/23/action-on-iran-new-laws-for-securing-borders-texas-land-our-citizens-and-elections/ (June 23, 2025)).

[4] *S.B. 10 H. Floor Debate*, 2025 Leg., 89th Reg. Sess. 5:06:43–5:06:49 (May 24, 2025), https://house.texas.gov/videos/22257 (statement of Rep. Noble).

[5] *Id.* at 5:07:15–5:07:37 (statement of Rep. Noble).

[6] *Id.* at 5:56:28–5:56:57 (statement of Rep. Dutton).

73.     During a legislative hearing, Sen. Donna Campbell, a primary author of S.B. 10, also emphasized the importance of introducing schoolchildren to scripture: "God tells us in Joshua 1:9 to be strong and courageous. Don't be afraid. Don't be discouraged, because the Lord, thy God is with us throughout our life. There is an afterlife. There is eternal life. And if we don't expose— or introduce is a better word—our children and others to that, when they die, they had one birth, two deaths, because they will know nothing about the afterlife, the eternity with God. But exposing them or introducing them to Ten Commandments [and] prayer, it asks other questions, and they then have a choice in their future. Two births, and one death. And this is what we're doing. Prayer gives us our faith. The Ten Commandments, while they are laws, actually expand our freedoms. That's what we're about."[7]

74.     During the same hearing, Sen. Campbell also chastised a Baptist reverend who testified against a separate bill that would authorize public schools to institute official periods of prayer, warning the minister: "Perhaps the nationally accredited chaplaincy provides you the foundation for your beliefs in your testimony here, but the Baptist doctrine is Christ-centered. Its purpose is not to go around trying to defend this or that. It is to be a disciple and a witness for Christ. That includes the Ten Commandments, that's prayer in schools. It is not a fight for separation between church and state."[8]

75.     Reacting to testimony supporting S.B. 10 and the school-prayer bill, Sen. Tan Parker, another primary author of S.B. 10, revealed: "I'm in shock . . . that only twenty-five percent of our kids today in schools have been in a church. That should make everybody listening

_____

[7] *S.B. 10 Hearing Before S. Comm. on Educ. K-16*, 2025 Leg., 89th Reg. Sess. 2:11:53– 2:13:12 (Mar. 4, 2025), https://www.senate.texas.gov/videoplayer.php?vid=21245&lang=en (statement of Sen. Campbell).

[8] *Id.* at 2:47:00–2:47:27 (statement of Sen. Campbell).

absolutely scared to death. I mean, obviously, only the Lord can save us, and we need to engage in prayer. But to realize only twenty-five percent of our kids in schools today have been in a church is absolutely horrific and something we all need to work on to address."[9]

76.    In considering S.B. 10, lawmakers repeatedly rejected proposed amendments that would have required parental consent for the Ten Commandments displays or that would have required the simultaneous display of religious texts and tenets from other faiths. Lawmakers also dismissed concerns that S.B. 10 would spiritually burden non-Christian students. For example, during the Senate discussion of the bill, primary S.B. 10 author Sen. Brent Hagenbuch explained: "Christians have been intimidated and afraid to talk about or express their faith at work and in school in this country. Christians are the majority, pretty clearly. We, with our faith, but more importantly in this context as Texans, the majority needs to look out for the minority, I understand, and be careful not to trample them. *But we've gone too far there* . . . So, I think it's important that we're able to have the freedom to express our faith . . . through the Ten Commandments . . . ."[10]

77.    After one legislator pointed to "Muslim students that are being bullied in Texas public schools" and "Jewish students being bullied" as a reason to avoid imposing Christian scripture in classrooms, Rep. Noble doubled down, declaring: "Oh, then we really need the Ten Commandments in there on how to treat others kindly."[11] And after being advised that Texas public "schools also serve students of other faith backgrounds," including "Muslim students, Hindu students, Buddhist students, Sikh students, [and] atheist students"—and asked how it will make "a

---

[9] *Id.* at 2:02:23–2:02:50 (statement of Sen. Parker).
[10] *S.B. 10 S. Debate*, 2025 Leg., 89th Reg. Sess. 25:48–26:36 (Mar. 19, 2025), https://www.senate.texas.gov/videoplayer.php?vid=21416&lang=en    (statement    of    Sen. Hagenbuch) (emphasis added).
[11] *S.B. 10 Hearing Before H. Comm. on Pub. Educ.*, 2025 Leg., 89th Reg. Sess. 6:41:41–6:41:45 (Apr. 29, 2025) https://house.texas.gov/videos/21958 (statement of Rep. Noble).

Hindu student feel to have a poster in every classroom that says, 'Thou shalt not worship any God before me'"—Noble replied: "I don't know. I haven't asked one. Have you?"[12] She went on to imply that these students are interlopers, stating, "I assume they're Americans now? I think that they would find it interesting to see what was important and foundational to our forefathers that made this nation a place that they wanted to come and live and raise a family and be part of it."[13]

78.    As a result of the displays mandated by S.B. 10, students who do not subscribe to the state's official version of the Ten Commandments or whose faith tenets and values are otherwise contradicted by the displays will be pressured into religious observance, veneration, and adoption of this religious scripture. These students will also be pressured to suppress expression or practice of their own faiths and religious beliefs or nonreligious beliefs in view of their peers, teachers, and other school staff.

**Despite the _Nathan_ and _Cribbs Ringer_ Courts' Rulings, Defendants Have Posted Unconstitutional Ten Commandments Displays.**

79.    On July 2, 2025, a group of multifaith and nonreligious Texas families filed a lawsuit in the Western District of Texas against Alamo Heights Independent School District, North East Independent School District, Lackland Independent School District, Northside Independent School District, Austin Independent School District, Lake Travis Independent School District, Dripping Springs Independent School District, Houston Independent School District, Fort Bend Independent School District, Cypress Fairbanks Independent School District, and Plano Independent School District, seeking to enjoin the school districts from complying with S.B. 10. _See_ Complaint, No. 25-cv-00756, ECF No. 1 (W.D. Tex. July 2, 2025).

---

[12] _Id._ at 6:40:31–6:40:44 (statement of Rep. Noble).
[13] _Id._ at 6:40:51–6:41:05 (statement of Rep. Noble).

80.     On August 20, 2025, this district court entered a preliminary injunction enjoining certain school district defendants from posting the Ten Commandments pursuant to S.B. 10.[14] *Nathan*, 2025 WL 2417589, at *29. Denying a motion to dismiss the complaint, the district court held that the plaintiffs satisfied the standing and ripeness requirements of Article III of the U.S. Constitution, *id.* at *14, and that the plaintiffs were likely to succeed on the merits of their Establishment Clause and Free Exercise claims, *id.* at *25–28.

81.     Following the *Nathan* court's ruling, plaintiffs' counsel in *Nathan* sent a letter to every school superintendent in Texas (other than the superintendents of the defendant school districts in *Nathan*) to inform them of the court's ruling. The letter noted that, although the districts technically may not be bound by the court's ruling, they have an independent legal obligation to respect their students' constitutional rights. The letter further informed the superintendents that, "[i]n light of the court's August 20 ruling that S.B. 10 is unconstitutional, any school district that implements S.B. 10 will be violating the First Amendment and could be inviting additional litigation."

82.     On August 25, 2025, the Texas Attorney General (the "Attorney General") issued a press release directing all Texas Independent School Districts not enjoined by ongoing litigation to display copies of the Ten Commandments in compliance with S.B. 10.[15]

---

[14] Following a joint stipulation of dismissal, on August 19, 2025, the court entered an order dismissing Austin Independent School District without prejudice. *See* Order of Dismissal Without Prejudice of Def. Austin Indep. Sch. Dist., No. 25-cv-00756, ECF No. 77 (W.D. Tex. Aug. 19, 2025). The court further ordered that Austin ISD would be subject to and bound by any order or injunction issued by the court enjoining compliance with S.B. 10 as if it were still a defendant in the matter, that Austin ISD had disclaimed any intent to comply with S.B. 10 during the pendency of the litigation, and that Austin ISD would take all necessary actions to ensure each school within the district abides by the court's order and any final result in the case. *See id.* at 2.

[15] *Attorney General Ken Paxton Instructs Texas Schools to Display the Ten Commandments in Accordance with Texas Law*, Office of the Attorney General of Texas (Aug.

83.     Then on October 1, 2025, the Attorney General issued a legal advisory, dated September 26, 2025, to all Texas school districts (the "Legal Advisory"). The Legal Advisory indicated that the Attorney General would take legal action against school districts that do not comply with S.B. 10.[16]

84.     Consistent with the threats of enforcement set forth in the Legal Advisory, on November 7, 2025, the Attorney General sued Galveston Independent School District and the members of its Board of Trustees in Galveston County, Texas, after the school board voted against displaying the Ten Commandments.[17] Then on November 13, 2025, the Attorney General's office sued Round Rock Independent School District, Leander Independent School District, and the members of their respective Boards of Trustees.[18] The State's complaints seek, in addition to other relief, a temporary restraining order and permanent injunctive relief requiring compliance with S.B. 10.[19]

---

25, 2025), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-instructs-texas-schools-display-ten-commandments-accordance-texas-law (last visited Nov. 23, 2025).

[16] *Advisory on School District Compliance with Senate Bill 10*, Texas Attorney General (Sept. 26, 2025), https://www.texasattorneygeneral.gov/sites/default/files/images/press/Advisory%20on%20Texas%20Law%20Upon%20Enactment%20of%20Senate%20Bill%2010.pdf (last visited Nov. 23, 2025).

[17] *See State of Texas v. Galveston Indep. Sch. Dist.*, "State of Texas' Original Petition and Application for Injunctive Relief" (Galveston Cnty. 2025), https://www.texasattorneygeneral.gov/sites/default/files/images/press/Petition_1.pdf?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term= (last visited Nov. 23, 2025) (the "Galveston Petition").

[18] *See State of Texas v. Round Rock Indep. Sch. Dist.*, "State of Texas' Original Petition and Application for Injunctive Relief" at 2 (Williamson Cnty. 2025), https://www.texasattorneygeneral.gov/sites/default/files/images/press/Round%20Rock%20Leander%2010%20Commandments%20Petition.pdf (last visited Nov. 23, 2025) (the "Round Rock Petition").

[19] *See* Galveston Petition at ¶¶ 17, 23–24; *see also* Round Rock Petition at ¶¶ 24, 30–31.

85.    On November 18, 2024, this district court again entered a preliminary injunction enjoining additional school district defendants from posting the Ten Commandments pursuant to S.B. 10.[20] Order, *Cribbs Ringer*, No. 25-cv-01181, ECF No. 68. As in *Nathan*, the district court denied a motion to dismiss the complaint, holding that the plaintiffs satisfied the standing and ripeness requirements of Article III of the U.S. Constitution and that plaintiffs are likely to prevail on the merits of their claim. *Id.* at 6, 8, 12.

86.    Despite the *Nathan* and *Cribbs Ringer* rulings and the warnings by plaintiffs' counsel in *Nathan*, the Defendant School Districts have already displayed Ten Commandments posters in their schools pursuant to S.B. 10.

87.    Defendant Schertz-Cibolo-Universal City Independent School District is a public school district located in Schertz, Texas. By accepting donations of Ten Commandments posters and directing their display, Defendant Schertz-Cibolo-Universal City ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

88.    Defendant Medina Valley Independent School District is a public school district located in Castroville, Texas. By accepting donations of Ten Commandments posters and directing

---

[20] Following joint stipulations of dismissal, the court entered orders dismissing Arlington Independent School District, Order, No. 25-cv-01181, ECF No. 51 (W.D. Tex. Oct. 24, 2025), and McAllen Independent School District, Order, No. 25-cv-01181, ECF No. 54 (W.D. Tex. Oct. 30, 2025), without prejudice. The court further ordered that Arlington ISD and McAllen ISD would be subject to and bound by any order or injunction issued by the court enjoining compliance with S.B. 10 as if they were still defendants in the matter, that Arlington ISD and McAllen ISD had disclaimed any intent to comply with S.B. 10 during the pendency of the litigation, and that Arlington ISD and McAllen ISD would take all necessary actions to ensure each school within each district abides by the court's order and any final result in the case. *See* Order, No. 25-cv-01181, ECF No. 51 at 2 (W.D. Tex. Oct. 24, 2025); Order, No. 25-cv-01181, ECF No. 54 at 2 (W.D. Tex. Oct. 30, 2025).

their display, Defendant Medina Valley ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

89.     Defendant Hurst-Euless-Bedford Independent School District is a public school district located in Bedford, Texas. By accepting donations of Ten Commandments posters and directing their display, Defendant Hurst-Euless-Bedford ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

90.     Defendant Carroll Independent School District is a public school district located in Southlake, Texas. By accepting donations of Ten Commandments posters and directing their display, Defendant Carroll ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

91.     Defendant Katy Independent School District is a public school district located in Katy, Texas. By accepting donations of Ten Commandments posters and directing their display, Defendant Katy ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

92.     Defendant Wylie Independent School District is a public school district located in Wylie, Texas. By accepting donations of Ten Commandments posters and directing their display, Defendant Wylie ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

93.     Defendant Prosper Independent School District is a public school district located in Prosper, Texas. By accepting donations of Ten Commandments posters and directing their display, Defendant Prosper ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

94.    Defendant Deer Park Independent School District is a public school district located in Deer Park, Texas. By accepting donations of Ten Commandments posters and directing their display, Defendant Deer Park ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

95.    Defendant Argyle Independent School District is a public school district located in Flower Mound, Texas. By accepting donations of Ten Commandments posters and directing their display, Defendant Argyle ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

96.    Defendant Magnolia Independent School District is a public school district located in Magnolia, Texas. By accepting donations of Ten Commandments posters and directing their display, Defendant Magnolia ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

97.    Defendant Richardson Independent School District is a public school district located in McAllen, Texas. By accepting donations of Ten Commandments posters and directing their display, Defendant Richardson ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

98.    Defendant Clear Creek Independent School District is a public school district located in Houston, Texas. By accepting donations of Ten Commandments posters and directing their display, Defendant Clear Creek ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

99.    Defendant Fort Sam Houston Independent School District is a public school district located in San Antonio, Texas. By accepting donations of Ten Commandments posters and

directing their display, Defendant Fort Sam Houston ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

100. Defendant Liberty Hill Independent School District is a public school district located in Liberty Hill, Texas. By accepting donations of Ten Commandments posters and directing their display, Defendant Liberty Hill ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

101. Defendant Pearland Independent School District is a public school district located in Pearland, Texas. By accepting donations of Ten Commandments posters and directing their display, Defendant Pearland ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

102. Defendant Birdville Independent School District is a public school district located in Haltom City, Texas. By accepting donations of Ten Commandments posters and directing their display, Defendant Birdville ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

**Plaintiffs Will Be Harmed by S.B. 10's Scriptural Displays.**

103. As set forth further below, the religious displays mandated by S.B. 10 will harm Texas elementary and secondary schoolchildren in a variety of ways. Principal among these harms, the displays will: (1) forcibly subject the minor-child Plaintiffs to religious doctrine and beliefs in a manner that conflicts with their families' religious and nonreligious beliefs and practices; (2) send a marginalizing message to the minor-child Plaintiffs and their families that they do not belong in their own school community because they do not subscribe to the state's preferred religious text; (3) religiously coerce the minor-child Plaintiffs by pressuring them to observe, meditate on, venerate, and follow the state's favored religious text, and by pressuring them to

suppress expression of their own religious or nonreligious beliefs and backgrounds at school; and (4) substantially interfere with the religious development of the minor-child Plaintiffs and threaten to undermine the beliefs, practices, and values regarding matters of faith that the parent-Plaintiffs wish to instill in their children, thereby usurping the parents' authority to direct their children's religious education and religious or nonreligious upbringing.

*Plaintiffs Odulia Ashby, Kevin Ashby, and their minor child*

104.    Plaintiffs Odulia Ashby and Kevin Ashby are agnostic and atheist. Their family does not attend church. They are raising N.A. in a secular household that gives them the space and autonomy to develop their own beliefs and views about religion. The Ashby family does not regularly observe or adhere to any religious text, practice, or ritual, nor had they discussed the Bible or the Ten Commandments with N.A. prior to the passage of S.B. 10.

105.    The Ashby family does not subscribe to the religious dictates of the Ten Commandments. Therefore, on behalf of themselves and on behalf of N.A., they object to the school displays mandated by S.B. 10 because the displays promote and forcibly subject their child to religious scripture that they do not believe in and that they do not teach their child.

106.    The displays mandated by S.B. 10 substantially interfere with how the Ashbys are directing N.A.'s religious and moral development. As N.A.'s parents, they have chosen not to teach the Ten Commandments in their house. The Ashbys teach their child that they should welcome all religions and that they are free to explore religion if they so choose. However, the state-mandated Ten Commandments displays tell their child that "I AM the LORD thy God" and "Thou shalt have no other gods before me." The displays impose on their child one set of religious values and beliefs over their family's values, which are not based in religion. The displays thus undermine the beliefs, values, and practices pertaining to religious matters that they seek to instill

in their child as part of their secular household. The Ashbys do not want the government to push

any particular religion or religious morality on their child.

107.    S.B. 10's religious displays pressure N.A. to observe, venerate, and adopt the state's

preferred religious doctrine. N.A. feels that, by requiring the Ten Commandments posters, the

government is telling them what they should believe, which makes N.A. feel upset and singled out

because N.A. is not religious. N.A. cannot avoid reading the posters and gets distracted by the text

that is directing N.A. to adhere to a specific religious belief. The displays also lead to peer-on-peer

harassment, ostracism, and social isolation of their child because N.A. is not religious. N.A.

expressed to classmates that N.A. believes the Ten Commandments posters should not be on the

classroom walls. In response, N.A.'s classmates got mad at N.A. and told N.A. that it is "weird not

to believe," that N.A. "should believe," and questioned what N.A.'s parents are teaching at home.

Multiple classmates and friends stopped talking to N.A. because N.A. expressed that they are not

religious and disagree with the posters.

108.    Finally, for the reasons above, the displays mandated by S.B. 10 directly interfere

with and substantially burden Mr. and Mrs. Ashby's ability to direct N.A.'s religious education

and development in a manner that emphasizes and instills secular values and a worldview that

allows their child to form their own beliefs regarding questions of faith and morality.

*Plaintiff Von Marie Rivera and her minor child*

109.    Plaintiff Von Marie Rivera is not religious and is raising her child in a nonreligious

tradition and household that gives F.A.D.R. the space and autonomy to develop F.A.D.R.'s own

beliefs and views about religion. The family does not observe or adhere to any religious text,

practice, or ritual.

110.    Ms. Rivera does not subscribe to the religious dictates of the Ten Commandments. Therefore, on behalf of herself and on behalf of F.A.D.R., she objects to the school displays mandated by S.B. 10 because the displays promote and forcibly subject her child to religious scripture that the family does not believe in and that she does not teach F.A.D.R.

111.    The displays mandated by S.B. 10 will substantially interfere with F.A.D.R.'s development when it comes to religious questions and matters and will threaten to undermine the beliefs, values, and practices pertaining to religious matters that Ms. Rivera seeks to instill in F.A.D.R. as part of their nonreligious household. Specifically, the displays will impose on F.A.D.R. one set of religious values and beliefs in contravention of their family's values, which are not based in religion. Ms. Rivera wants her child to be free to explore various religions or no religion without pressure, especially from the government, to conform to any particular religion. She does not want the government to push any particular religion or religious morality on F.A.D.R.

112.    By imposing the Ten Commandments on F.A.D.R. for nearly every hour of the school day, the displays required by S.B. 10 will send a harmful message to F.A.D.R. that the school and other government authorities prefer one religion over all others, including nonreligion, and those that do not align with that specific religious tradition are wrong or immoral. It will also send the coercive message that the displays set forth authoritative rules that must be followed for F.A.D.R. to be considered a "good person." This is especially true for F.A.D.R. because F.A.D.R. has special needs and is neurodivergent—F.A.D.R. often views things in literal, black-and-white terms, and Ms. Rivera fears F.A.D.R. will interpret the Commandments as literal rules that must be followed. The displays will thus pressure F.A.D.R. to pretend to, or to actually, observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

113.    The displays are also likely to lead to peer-on-peer bullying, shaming, and ostracization of F.A.D.R. because F.A.D.R. and Ms. Rivera's family are not religious. Ms. Rivera has purposefully not introduced religion to F.A.D.R. because she does not believe it to be developmentally appropriate to do so yet and because she does not want F.A.D.R. to have anxiety about being different from F.A.D.R.'s peers in this regard. But Ms. Rivera fears that the displays will force this issue, and that F.A.D.R. will come to understand that the family's nonreligious background sets them apart and thereby increase the pressure on F.A.D.R. to suppress expression of the family's nonreligious background and views at school.

114.    Further, as a nonreligious parent, Ms. Rivera believes it is important that F.A.D.R. is raised to be open to exploring all religions when it is developmentally appropriate. But Ms. Rivera fears that S.B. 10's displays will interfere with that independent exploration by pressuring F.A.D.R. to adopt the state's preferred religious doctrine.

115.    Ms. Rivera also finds the specific language of the state-mandated Ten Commandments to be objectionable. For example, the displays required under S.B. 10 reference adultery. Ms. Rivera does not believe that this topic is appropriate to discuss in the classroom, and she not want her child's teachers explaining "adultery" to her child in the context of religious doctrine. The displays also reference killing. Ms. Rivera does not want F.A.D.R., in this current developmental phase, to be exposed to this concept at school, especially because F.A.D.R. already has fear and anxiety around the concept of death. Instead of bringing clarity to F.A.D.R. about issues of morality, the displays will only confuse F.A.D.R.

116.    Finally, for the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Ms. Rivera's ability to direct F.A.D.R.'s education pertaining to religious questions and matters in a manner that emphasizes and instills nonreligious values.

*Plaintiff Caitlyn Besser and her minor children*

117.    Plaintiff Caitlyn Besser is a Unitarian Universalist ("UU"), and she is raising her children in their local Unitarian Universalist Congregation. They attend their UU church regularly. UU is a non-doctrinal but covenantal religion; there is no set of required beliefs and no religious text that is the only truth, but members make a covenant to treat each other with respect. They commit to shared values and principles. They are guided by seven principles that include (1) The inherent worth and dignity of every person, (2) Justice, equity, compassion in human relations, (3) Welcome and acceptance of one another in a spirit of tolerance, (4) A free and responsible search for truth and meaning, (5) The right of conscience and the use of the democratic process within their congregations and in society, (6) The goal of world community with peace, liberty, and justice for all, and (7) Respect for the interconnected web of all existence. As part of her faith, Mrs. Besser believes that all people, including her children, should have the freedom to develop their own beliefs and views about religion, without pressure from others.

118.    Mrs. Besser's family does not subscribe to the religious dictates of the Ten Commandments. Therefore, on behalf of herself and her children, she objects to the school displays mandated by S.B. 10 because the displays promote and forcibly subject her children to religious scripture that her family does not believe in and that she does not teach them.

119.    The displays mandated by S.B. 10 substantially interfere with how Mrs. Besser is directing her children's religious and moral development. The religious directives contained in the Ten Commandments posters are inconsistent with and, at times, directly contradict the UU principles she is instilling in her children. Consistent with these principles, she teaches their children that there is no one set of religious rules they must obey. She teaches them that all people, no matter their religion, have inherent worth and that they should seek to create a welcoming and

inclusive community. She teaches them the importance of equity and compassion. And she teaches them that each person is on their own search for meaning. Therefore, the directive of "I AM the LORD thy God" and "Thou shalt have no other gods before me" directly contradicts what she is teaching her children. The required Ten Commandments posters tell her children what to believe, specifically dictating that there is one God they must follow. That message interferes with her teachings that they can adhere to whatever faith brings them meaning and that people of other faiths—including polytheistic faiths—should be treated with respect and equity. The displays thus undermine the UU beliefs, values, and practices that she seeks to instill in her children. Specifically, the displays impose on her children one set of religious values and beliefs over their UU values and beliefs. She does not want the government to push any particular religion or religious morality on her children. It is her right as their parent to direct their religious development, not the right of the government.

120.     By imposing the Ten Commandments on her children for nearly every hour of the school day, the displays required by S.B. 10 also send a confusing and harmful message that those who do not follow the Ten Commandments are less worthy and outsiders in the school community. The displays are likely to lead to peer-on-peer harassment, ostracism, and social isolation of her children because their family is UU. Her children are hesitant to express their family's beliefs at school and feel pressure to express a religious belief in the Ten Commandments in order to fit in with their classmates. After the displays were posted, S.B. worried about getting in trouble if S.B. said the wrong thing about the Ten Commandments. S.B. is anxious about the Ten Commandments posters because of bullying S.B. has experienced because of their religious beliefs. Earlier in the school year, a classmate called S.B. a "monster" and "soulless" because S.B.'s faith was different than theirs. The classmate constantly harassed S.B. about why S.B. doesn't believe in God. S.B.

began telling the classmate that S.B. believes in God, just in a different way, to stop the harassment. S.B. has had to move seats in the classroom even though S.B. is entitled to sit in the front of the classroom because of their ADHD, as directed by their 504 plan. The Ten Commandments displays risk further marginalization of Mrs. Besser's children and pressure her children to observe, venerate, and adopt the state's preferred religious doctrine. And in turn, her children are confused and question what she is teaching them at home.

121.    Further, Mrs. Besser finds the specific language of the state-mandated Ten Commandments to be objectionable because it introduces topics, such as adultery, killing, and coveting "thy neighbor's wife[,] . . . manservant[, or] . . . his maidservant" that are not appropriate for her children. Mrs. Besser believes that these concepts are far too mature for S.B.'s and V.B.'s ages. She does not want to have these topics imposed on her children before she chooses. Mrs. Besser believes that instead of bringing clarity to them about issues of morality, the displays will only confuse them.

122.    Finally, for the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Mrs. Besser's ability to direct her children's religious education and development in the UU tradition.

*Plaintiff Marissa Gottlieb and her minor children*

123.    Plaintiff Marissa Gottlieb is spiritual, from a Christian extended family, and of mixed Chinese and European heritage. Her husband is Jewish and of European ancestry. They are raising their children in an interfaith, multicultural household that observes Christian and Jewish religious traditions, as well as Chinese cultural and spiritual practices.

124.    As part of their interfaith household, Ms. Gottlieb and her husband navigate a complex and careful path in guiding the spiritual development of their children, who are being

raised in both Jewish and Christian religious traditions and with Chinese spiritual practices. For example, they light candles for Hanukkah, host a Passover Seder, and send their children to Jewish summer camps. They also celebrate Christmas and share biblical stories, including the birth of Jesus, because that is one of the ways Ms. Gottlieb's family members practice their faith, and she wants her children to share that connection with their family. For the Chinese Lunar New Year, they decorate their home with red and lanterns, share dumplings and hot pot, exchange red envelopes, and honor their ancestors. They also invite prosperity into the new year with traditions like welcoming Caishen, the God of Wealth.

125.     In teaching their children about their family's faiths and traditions, Ms. Gottlieb and her husband recognize and emphasize to their children that it is ultimately their right to explore different religious practices and to decide, when they are old enough, what faith system, if any, they will follow. Ms. Gottlieb also purposefully exposes her children to the diverse religious and cultural practices of others in their community. As part of that education, Ms. Gottlieb emphasizes to her children that they are a multicultural and multi-faith family, that many families practice different traditions and beliefs, and that there is no one "right way" to be a good person. In sum, Ms. Gottlieb teaches her children to embrace tolerance and open-mindedness, and she introduces religious and cultural practices gradually and in an age-appropriate way that aligns with her parenting goals.

126.     Ms. Gottlieb's family acknowledges that the Ten Commandments are important in both the Jewish and Christian religions. But in her household, they do not treat the Ten Commandments as the singular, authoritative source of morality or religious truth. Instead, she chooses to present her children with many different faith practices and teachings, and she emphasizes respect for the variety of traditions her family embodies. Further, the specific,

Protestant version of the Ten Commandments mandated by S.B. 10 is not the version Ms. Gottlieb's family subscribes to in their Jewish and Christian religious practices.

127.    The displays mandated by S.B. 10 substantially interfere with Ms. Gottlieb's children's development when it comes to religious questions and matters and will threaten to undermine the beliefs, values, and practices pertaining to religious matters that she seeks to instill in them as part of their interfaith household. Specifically, the displays indicate to Ms. Gottlieb's children that only one set of religious values and beliefs are acceptable or approved by the government, in contravention of Ms. Gottlieb's inclusive religious teachings. The displays also introduce her children to content that she does not feel is age-appropriate and that does not align with her parenting and religious philosophy of teaching tolerance of differences. For example, in H.G.'s case, Ms. Gottlieb waited until H.G. was developmentally ready to explain how their relatives were murdered in the Holocaust and the story of how H.G.'s great-grandmother survived. Ms. Gottlieb connects that history to the moral lesson of why governments must never favor one religion over another, and why tolerance matters. Ms. Gottlieb fears that S.B. 10's displays will force her to have similar conversations with B.G. and L.G. before they are ready. She plans to teach all of her children that the freedom of religion is among the most important American values — a protection meant to keep all families safe, no matter their faith. In sum, she does not want the government to push any particular religion or religious morality on her children or to interfere with her right to guide the content and timing of her children's moral and religious upbringing.

128.    By imposing the Ten Commandments on Ms. Gottlieb's children for nearly every hour of the school day, the displays required by S.B. 10 also send a harmful message to them that the school district and other government authorities prefer one religion over all others, including interfaith practices, and those that do not align with that specific religious tradition are wrong and

unwelcome. It also sends the coercive message that the displays contain rules that must be followed for Ms. Gottlieb's children to be considered "good people" or to be welcomed in their school community.

129.    The displays are also likely to lead to peer-on-peer bullying, shaming, and ostracization of Ms. Gottlieb's children because of their interfaith family. Even before S.B. 10, H.G. felt different from H.G.'s majority Christian classmates, some of whom questioned the family's Jewish practices. The displays have only increased this pressure on H.G. to conform with the school's primarily Christian majority. Ms. Gottlieb also fears that her children, especially the younger B.G. and L.G., will interpret the displays as authoritative rules that they must follow and will fear the consequences of violating them. As a result, the displays put pressure on her children to suppress expression of their family's interfaith background and views at school, and to pretend to, or to actually, observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

130.    Ms. Gottlieb also finds the specific language of the state-mandated Ten Commandments to be objectionable. For example, the displays reference death in the Commandment "Thou shalt not kill." She does not wish her younger children to be discussing death and killing in pre-school or elementary school, especially because L.G. has already expressed anxiety about death. The displays required under S.B. 10 also reference adultery. After the displays went up in L.G.'s classroom, Ms. Gottlieb and her husband had to explain the concept of "adultery" to L.G. long before they wanted to introduce it. L.G. was concerned about the word "adultery" and worried that it meant being an adult was a bad thing. Further, Ms. Gottlieb does not believe that this topic is appropriate to discuss in the classroom, and she does not want her children's teachers explaining "adultery" to the class in the context of religious doctrine.

131.    Additionally, Ms. Gottlieb objects to the specific language of the Commandments "I am the Lord thy God" and "Thou shalt have no other gods before me." These passages conflict with her family's interfaith and multicultural spiritual traditions, and she does not want the displays to turn these joyful traditions into something her children may see as wrong or disobedient. She also does not want the displays to undermine her teachings to her children that people of all religious backgrounds deserve respect. Instead of bringing clarity to them about issues of morality, the displays will only confuse them.

132.    Finally, for the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Ms. Gottlieb's ability to direct her children's education pertaining to religious questions and matters in a manner that emphasizes and instills respect and tolerance for diverse religions in general, and her interfaith household specifically.

*Plaintiff Kasey Malone and her minor child*

133.    Plaintiff Kasey Malone does not practice any religion and identifies as an atheist. She is raising E.M. in a nonreligious tradition, which includes teaching E.M. to respect everyone's beliefs and accept their differences. She does not regularly observe or adhere to any religious text, practice, or ritual.

134.    Ms. Malone's family does not subscribe to the religious dictates of the Ten Commandments. Therefore, on behalf of herself and her child, she objects to the school displays mandated by S.B. 10 because the displays promote and forcibly subject E.M. to religious scripture that she does not believe in and that she does not teach E.M.

135.    Ms. Malone believes that it is her sole responsibility as a parent to direct E.M.'s religious upbringing. As part of this, Ms. Malone exposes E.M. to a number of different religious traditions so that E.M. has the opportunity to learn about various faiths and to learn that there is

not one dominant or superior religion or belief system. For example, when E.M. was younger, Ms. Malone took E.M. to different types of religious services, including Christian, Greek Orthodox, and Muslim services. Ms. Malone wants E.M. to be able to make an informed choice about if and how to engage with religion.

136.    The displays mandated by S.B. 10 will substantially interfere with E.M.'s development when it comes to religious questions and matters and will threaten to undermine the beliefs, values, and practices pertaining to religious matters that Ms. Malone seeks to instill in E.M. as part of their nonreligious household. Specifically, the displays impose on E.M. one set of religious values and beliefs over the family's values, which are not based in religion. Ms. Malone does not want the government to push any particular religion or religious morality on E.M.

137.    For example, the displays emphasize the need to worship and believe in God, honor the Sabbath, and observe other religious commandments that Ms. Malone's family does not observe. At home, she teaches E.M. that goodness is inherent in everyone and that one can be a good and moral person even if they are not religious. But the displays send the message that religion, and Christianity in particular, is necessary to be a good person, in contrast with the values Ms. Malone seeks to instill in E.M.

138.    By imposing the Ten Commandments on E.M., the displays required by S.B. 10 send a harmful message to E.M. that E.M is an outsider because E.M. is not being raised as a Christian. The displays thus pressure E.M. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

139.    Because E.M. is not religious, the displays are also likely to lead to peer-on-peer harassment, ostracism, and additional proselytization. E.M. is anxious and wants to fit in, and has previously expressed willingness to go along with certain religious activities to avoid being

"treated differently" or "frowned upon," even when those activities make E.M. uncomfortable. As a result, the displays mandated by S.B. 10 in the classroom may lead E.M. to suppress their non-religious beliefs during school.

140.    For the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Ms. Malone's ability to direct E.M.'s religious education and development in a manner that emphasizes and instills secular values and a worldview that allows E.M. to form their own beliefs regarding questions of faith and morality.

*Plaintiff Veronica McKay and her minor child*

141.    Plaintiff Veronica McKay is spiritual and nonreligious, her husband is Christian, and they are raising their child, A.M., in a spiritual, open tradition that is not affiliated with any organized religion. Their household gives A.M. the space and autonomy to develop A.M.'s own beliefs and views about religion. Although Ms. McKay may discuss different types of religion from time to time if A.M. has questions, and allows A.M. to attend religious services with friends, their family does not observe or adhere to any religious text, practice, or ritual as a family.

142.    Ms. McKay's family does not subscribe to the religious dictates of the Ten Commandments. Therefore, on behalf of herself and her child, she objects to the school displays mandated by S.B. 10 because the displays promote and forcibly subject her child to religious scripture that they do not believe in and that Ms. McKay does not teach her child.

143.    The displays mandated by S.B. 10 substantially interfere with A.M.'s development when it comes to religious questions and matters and will threaten to undermine the beliefs, values, and practices pertaining to religious matters that Ms. McKay seeks to instill in A.M. as part of their spiritual, but non-religiously affiliated household. Specifically, the displays impose on A.M. one set of religious values and beliefs in contravention of Ms. McKay's family's values, which are not

based in any organized religion. Ms. McKay raises A.M. with the freedom and independence to explore different religious paths, but she is worried that it will not be A.M.'s choice to explore Christianity, but rather the result of pressure inappropriately placed on A.M. by the government through the display of the Ten Commandments in A.M.'s classrooms. Ms. McKay does not want the government to push any religion or religious morality on A.M.

144.    By imposing the Ten Commandments on A.M. for nearly every hour of the school day, the displays required by S.B. 10 also send a harmful message to A.M. that the school and other government authorities prefer one religion over all others, including nonreligion, and those that do not align with that specific religious tradition are wrong and unwelcome. It also sends the coercive message that the displays contain rules that must be followed for A.M. to be considered a "good person." As a result, the displays put pressure on A.M. to pretend to, or to actually, observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

145.    The displays are also likely to lead to peer-on-peer bullying, shaming, and ostracization of A.M. because A.M. and Ms. McKay's family do not belong to any organized religion. Even before S.B. 10, A.M. felt pressured by certain classmates to conform with the school's predominately Christian affiliations. Since the displays have gone up, A.M. has told Ms. McKay that A.M. feels even more pressured to conform to Christianity and believe in a God. A.M. also feels distress about the ostracization of A.M. and A.M.'s peers of different faiths who do not subscribe to the Ten Commandments. As a result, the displays put pressure on A.M. to suppress expression of Ms. McKay's family's non-organized religious background and views at school.

146.    Further, as a parent, Ms. McKay believes it is important that A.M. be raised to be open to exploring all religions. But due to the harms that S.B. 10's displays are causing A.M. and

A.M.'s classmates, A.M. has already developed a more negative view of Christianity and might be deterred from exploring it.

147.    Ms. McKay also finds the specific language of the state-mandated Ten Commandments to be objectionable. For example, the displays required under S.B. 10 reference adultery. A.M. has already asked Ms. McKay what "adultery" means, which forced Ms. McKay to explain the concept long before she would have ever discussed it with A.M., and which caused A.M. confusion and anxiety about Ms. McKay and her husband's relationship. Further, Ms. McKay does not believe that this topic is appropriate to discuss in the classroom, and she does not want her child's teachers explaining "adultery" to the class in the context of religious doctrine. Additionally, Ms. McKay objects to the specific language of the commandments "I am the Lord thy God" and "Thou shalt have no other gods before me." These passages conflict with the spiritual viewpoints Ms. McKay seeks to instill in A.M., which are that there are many paths to holiness and that the most important values are to be welcoming, accepting, and charitable to their neighbors, no matter their differences. Instead of bringing clarity to A.M. about issues of morality, the displays will only confuse A.M.

148.    Finally, for the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Ms. McKay's ability to direct A.M.'s education pertaining to religious questions and matters in a manner that emphasizes and instills spiritual and non-religiously affiliated values and respect for, and interest in, a variety of diverse religions.

*Plaintiff Briana Pascual-Clement and her minor children*

149.    Plaintiff Briana Pascual-Clement was raised in the LDS Mormon faith but now identifies as agnostic. Her husband was raised in the LDS Mormon faith and remains a member of the LDS Mormon church. Ms. Pascual-Clement believes that all people, including her children,

should have the freedom to develop their own beliefs and views about religion, without pressure from others. She is raising her children in a household where they are allowed that freedom. Sometimes her children go to church with her husband, but not always. The children are allowed to decide whether they wish to go to church or not. If the children have questions about religion, Ms. Pascual-Clement and her husband discuss those questions with their children freely and answer as best they can. Ms. Pascual-Clement believes it is important for her children to understand people of other faiths.

150.    Ms. Pascual-Clement is raising her children in a household where they are free to develop their own beliefs and views about religion. The Ten Commandments displays mandated by S.B. 10 are inconsistent with this because they endorse one specific sect of Christianity and force that preferred religion on her children. She objects to the displays because they are not welcoming to all, and they interfere with her ability to teach her children that everyone has the right to make their own free choice about religion without undue influence from anyone, including the government, teachers, and school administrators. She objects to the school displays mandated by S.B. 10 because the displays promote and forcibly subject her children to religious scripture that she does not believe in and that she does not teach them.

151.    The displays mandated by S.B. 10 substantially interfere with how Ms. Pascual-Clement is directing her children's religious and moral development. She teaches her children that there is no one set of religious rules they must obey. She also teaches them that all people, no matter their religion, have inherent worth and that they should seek to create a welcoming and inclusive community. She teaches them the importance of equity and compassion. The required Ten Commandments displays contradict what Ms. Pascual-Clement is teaching her children by, among other things, telling her children what to believe and specifically dictating that there is only

one correct way to be a Christian. That message interferes with her teachings that they, and all people, can adhere to whatever faith they choose, and that people of other faiths should be treated with respect and equity. The displays thus undermine the beliefs, values, and practices that Ms. Pascual-Clement seeks to instill in her children. She sends her children to public schools in part because she does not want the government to push any particular religion or religious morality on her children.

152.    By imposing the Ten Commandments on A.P., E.I.P., N.P., and E.L.P. for nearly every hour of the school day, the displays required by S.B. 10 also send a confusing message to them that the Ten Commandments are rules that they must follow and that those who do not do so are "wrong," less worthy, and outsiders in the school community. The displays thus pressure Ms. Pascual-Clement's children to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

153.    The displays are also likely to lead to peer-on-peer harassment, ostracism, and additional proselytization of Ms. Pascual-Clement's children because members of her family are LDS Mormons. Classmates have already told A.P. and E.I.P. that they are "not real Christians" because they are Mormon. Displaying the Ten Commandments in all of the children's classrooms will exacerbate these issues. As a result, the displays also increase the pressure on A.P., E.I.P., N.P., and E.L.P. to suppress expression of their family's Mormon background and other views at school.

154.    Further, Ms. Pascual-Clement finds the specific language of the state-mandated Ten Commandments in S.B. 10 objectionable. It includes topics, such as adultery, that she does not wish to be explained to A.P., E.I.P., N.P., and E.L.P. by their teachers, should her children or other students ask about them. For example, the displays required under S.B. 10 reference adultery and

coveting "thy neighbor's wife." She does not believe that these are topics that are appropriate to discuss in the classroom, and she does not want her children's teachers explaining these topics to them, especially if introduced in the context of religious doctrine. Instead of bringing clarity to them about issues of morality, the displays will only confuse them.

155.    Finally, for the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Ms. Pascual-Clement's ability to direct her children's education pertaining to religious questions and matters in a manner that emphasizes and instills the belief that everyone has the right to make their own free choice about religion without undue influence from anyone, including the government, teachers, and school administrators.

*Plaintiff Nallely Sauceda and her minor child*

156.    Plaintiff Nallely Sauceda is nonreligious and is raising her minor child, M.S., in a nonreligious tradition and household, where M.S. is taught moral values without any reference to a god or higher power. The family does not observe or adhere to any religious text, practice, or ritual. When Ms. Sauceda does eventually explain religion to her child, it will be an inclusive overview of many different world religions and belief structures, rather than focusing solely on one Christian ideology.

157.    The displays mandated by S.B. 10 substantially interfere with M.S.'s development when it comes to religious questions and matters and will threaten to undermine the beliefs, values, and practices pertaining to religious matters that Ms. Sauceda seeks to instill in them as part of her nonreligious household. Specifically, the displays impose on M.S. one set of religious values and beliefs over their family's values, which are not based in religion. Ms. Sauceda chooses to send her child to public school because she does not want the government to push any particular religion or religious morality on M.S.

158.    By imposing the Ten Commandments on M.S. for nearly every hour of the school day, the displays required by S.B. 10 also send a confusing message to them that the Ten Commandments are rules that they must follow and that those who do not do so are "wrong," less worthy, and outsiders in the school community. M.S. is a rule-follower by nature. The displays thus pressure M.S. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

159.    The displays are also likely to lead to peer-on-peer harassment, ostracism, and additional proselytization of M.S. because they are not religious. Displaying the Ten Commandments in all of M.S.'s classrooms will increase the pressure on them to suppress expression of their family's nonreligious views at school and to conform to the views expressed in the Ten Commandments displays that are contrary to their family's beliefs.

160.    Further, Ms. Sauceda finds the specific language of the state-mandated Ten Commandments in S.B. 10 objectionable. It includes topics, such as murder and adultery, that are not age appropriate for M.S. Ms. Sauceda does not wish such topics to be explained to M.S. by their teachers, should M.S. or other students ask about them. Instead of bringing clarity to them about issues of morality, it will only confuse them. Ms. Sauceda does not believe that these are topics that are appropriate to discuss in the classroom, and she does not want her child's teachers explaining these topics to them, especially if introduced in the context of religious doctrine.

161.    Finally, for the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Ms. Sauceda's ability to direct M.S.'s education pertaining to religious questions and matters in a manner that emphasizes and instills nonreligious values.

*Plaintiff Emily Birtwistle and her minor child*

162.    Plaintiff Emily Birtwistle is nonreligious and is raising her child in a nonreligious tradition and household that gives D.B. the space and autonomy to develop D.B.'s own beliefs and views about religion. Although D.B. attends a non-denominational church with D.B.'s grandparents, which focuses on loving your neighbor and not the Ten Commandments, the family does not observe or adhere to any religious text, practice, or ritual.

163.    Ms. Birtwistle's family does not subscribe to the religious dictates of the Ten Commandments. Therefore, on behalf of herself and her child, she objects to the school displays mandated by S.B. 10 because the displays promote and forcibly subject her child to religious scripture that they do not believe in and that she does not teach D.B.

164.    The displays mandated by S.B. 10 substantially interfere with D.B.'s development when it comes to religious questions and matters and will threaten to undermine the beliefs, values, and practices pertaining to religious matters that Ms. Birtwistle seeks to instill in them as part of their nonreligious household. Specifically, the displays elevate and impose on D.B. one set of religious values and beliefs over their family's values, which are focused on being a good and caring person.

165.    By imposing the Ten Commandments on D.B. for nearly every hour of the school day, the displays required by S.B. 10 also send a confusing message to D.B., who is neurodivergent, that the Ten Commandments are authoritative rules that D.B. must follow and that those who do not do so are "wrong," less worthy, and outsiders in the school community. The displays thus pressure D.B. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine. Ms. Birtwistle wants her child to be free to explore various religions or no

religion without pressure, especially from the government, to conform to any particular religion. Ms. Birtwistle does not want the government to push any religion or religious morality on D.B.

166.    The displays are also likely to lead to peer-on-peer harassment, ostracism, and additional proselytization of Ms. Birtwistle's child because D.B. is not religious. D.B. already experiences feelings of difference and has had a peer tell D.B. that a family member will "go to hell" because of who the family member loves. Displaying the Ten Commandments in all of D.B.'s classrooms will exacerbate these issues. As a result, the displays also increase the pressure on D.B. to suppress expression of the family's nonreligious background and views at school.

167.    Further, Ms. Birtwistle finds the specific language of the state-mandated Ten Commandments in S.B. 10 antiquated, objectionable, and confusing. For example, D.B. will have questions about adultery and what it means to "covet thy neighbor's wife" as a result of the S.B. 10 displays. Ms. Birtwistle does not believe that these topics are appropriate to discuss in the classroom, and she does not want her child's teachers explaining these topics to them, especially if introduced in the context of religious doctrine. Instead of bringing clarity to D.B. about issues of morality, the displays will only confuse D.B.

168.    For the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Ms. Birtwistle's ability to direct D.B.'s education pertaining to religious questions and matters in a manner that emphasizes and instills nonreligious values.

*Plaintiff Matthew Foster and his minor children*

169.    Plaintiff Matthew Foster is agnostic, his wife is Christian, and they are raising their children in a non-religious household that embraces Christian cultural practices and gives J.F. and A.F. the space and autonomy to develop their own beliefs and views about religion. Although Mr. Foster may discuss different types of religion from time to time if J.F. and A.F. have questions,

and allows A.F. to attend Christian religious services at A.F.'s request, the Fosters do not observe or adhere to any religious text, practice, or ritual as a family.

170.    Mr. Foster does not subscribe to the religious dictates of the Ten Commandments. Therefore, on behalf of himself and on behalf of J.F. and A.F., he objects to the school displays mandated by S.B. 10 because the displays promote and forcibly subject his children to religious scripture that his family does not teach J.F. and A.F.

171.    The displays mandated by S.B. 10 substantially interfere with J.F. and A.F.'s development when it comes to religious questions and matters and will threaten to undermine the beliefs, values, and emphasis on religious exploration that Mr. Foster seeks to instill in J.F. and A.F. as part of Mr. Foster's nonreligious household. Specifically, the displays impose on J.F and A.F. a set of religious values and beliefs that Mr. Foster's family does not subscribe to and in place of his beliefs, which are not based in religion. He wants his children to be free to explore various religions or no religion without pressure, especially from the government, to conform to any particular religion. Mr. Foster does not want the government to push any religion or religious morality on J.F. and A.F.

172.    By imposing the Ten Commandments on J.F. and A.F. for nearly every hour of the school day, the displays required by S.B. 10 also send a confusing message to them that the Ten Commandments are rules that they must follow and that those who do not do so are "wrong," less worthy, and outsiders in the school community. Mr. Foster is concerned that J.F. and A.F. will view the displayed Ten Commandments as authoritative commands of the government. The displays particularly pressure J.F. and A.F. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine. While A.F. currently attends Christian religious services, Mr. Foster

wants A.F.—and J.F.—to feel free to explore any and all religions, without undue pressure from the government in the form of classroom "commands."

173.    The displays are also likely to lead to peer-on-peer harassment, ostracism, and additional proselytization of J.F. and A.F. because their family is not religious. Mr. Foster worries that displaying the Ten Commandments in J.F. and A.F.'s classrooms will exacerbate these issues. He particularly fears that J.F. and A.F. will be ostracized for their nonreligious family background, and that A.F. will feel pressured to continue A.F.'s attendance at Christian religious services, limiting the freedom of religious exploration that Mr. Foster has worked to maintain. As a result, the displays also increase the pressure on J.F. and A.F. to suppress expression of their family's nonreligious background and views at school, and to express beliefs that are contrary to their family's beliefs.

174.    Mr. Foster finds the specific language of the state-mandated version of the Ten Commandments in S.B. 10 objectionable. It includes topics, such as adultery and slavery, that he does not wish to be explained to J.F. and A.F. by their teachers, especially in a religious context, should J.F. and A.F. ask about them. Mr. Foster also objects to the Commandments, such as "I am the Lord thy God" and "Thou shalt have no other gods before me," which mandate the superiority of only one religious tradition. This conflicts with Mr. Foster's teachings at home that the children should respect people of all religions, or no religion at all, and that there is no "right way" to be a good person. Instead of bringing clarity to Mr. Foster's children about issues of morality, the displays will only confuse them.

175.    Finally, for the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Mr. Foster's ability to direct J.F. and A.F.'s education pertaining to

religious questions and matters in a manner that emphasizes and instills nonreligious values and encourages independent exploration and respect and tolerance for all religions.

*Plaintiff Whitney Keltch Green and her minor child*

176.    Plaintiff Whitney Keltch Green and her husband identify loosely as Christian, but they are currently raising their child, Z.G., in a nonreligious tradition and household that gives Z.G. the space and autonomy to develop Z.G.'s own beliefs and views about religion. Although Ms. Keltch Green may discuss the general concepts of God and heaven from time to time if Z.G. has questions, they do not observe or adhere to any religious text, practice, or ritual as a family. Ms. Keltch Green allows Z.G. to independently develop questions, interests, and decisions on religious matters in a child-led manner, informed by herself and her husband, and Ms. Keltch Green does not want Z.G.'s public school to interfere with these decisions and spiritual development.

177.    Ms. Keltch Green does not teach her child to follow the religious dictates of the Ten Commandments. Therefore, on behalf of herself and her child, Ms. Keltch Green objects to the school displays mandated by S.B. 10 because the displays promote and forcibly subject her child to religious scripture that they do not fully adhere to, or study or discuss at all, as a family unit and that Ms. Keltch Green does not teach her child.

178.    The displays mandated by S.B. 10 substantially interfere with Z.G.'s development when it comes to religious questions and matters and threaten to undermine the beliefs, values, and practices pertaining to religious matters that Ms. Keltch Green seeks to instill in Z.G. as part of their nonreligious household. Specifically, the displays impose on Z.G. one set of religious values and beliefs in contravention of Ms. Keltch Green's family's values, which are to respect and accept people of all faiths, and no faith at all, and to not push their religious views or spirituality onto

anyone. Ms. Keltch Green does not want the government to push any particular religion or religious morality on Z.G., or for Z.G. to see the government doing so to Z.G.'s classmates. Ms. Keltch Green worries that Z.G., through being subjected to the mandated displays, may come to believe that the Christian religion is somehow superior to other religions, and that the displays may unduly influence Z.G.'s own belief system, which Ms. Keltch Green wishes Z.G. to develop independently and through Z.G.'s own life experiences and curiosities.

179.     By imposing the Ten Commandments on Z.G. for nearly every hour of the school day, the displays required by S.B. 10 also send a harmful message to Z.G. that the school and other government authorities prefer one religion over all others, including nonreligion, and those that do not align with that specific religious tradition are wrong or immoral. It also sends the coercive message that the displays set forth authoritative rules that must be followed. Z.G. has anxiety and struggles with uncertainty, which Ms. Keltch Green fears will exacerbate the coercive nature of the displays—Z.G. will be confused as to which rules Z.G. must follow and wonder why the "rules," or commandments, at school are different from those Z.G. learns at home. The displays thus pressure Z.G. to pretend to, or to actually, observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

180.     The displays could also lead to peer-on-peer bullying, shaming, exclusion, and/or ostracization of Z.G. because Z.G. is not being raised in a religious tradition. For example, Z.G.'s Christian classmates recently hosted a "See You at the Pole" prayer event at school. This event made Z.G. feel confused and anxious. It made Z.G. question Z.G.'s own identity and belief system, and Z.G. came home to ask Ms. Keltch Green what Z.G. is "supposed" to do and believe. S.B. 10's displays further increase the pressure on Z.G. to suppress expression of the family's nonreligious background and views at school.

181.     Ms. Keltch Green also finds the specific language of the state-mandated Ten Commandments to be objectionable. For example, the displays required under S.B. 10 reference adultery. Ms. Keltch Green does not believe that this topic is appropriate to discuss in an elementary school classroom, and she does not want her child's teachers explaining "adultery" to the class in the context of religious doctrine. The displays also reference murder in the commandment "Thou shalt not kill." Ms. Keltch Green does not wish Z.G. to be discussing killing in elementary school. She wants herself and her husband to address these sensitive topics with Z.G.—not Z.G.'s teachers and classmates. Instead of bringing clarity to Z.G. about issues of morality, the displays will only confuse Z.G.

182.     Finally, for the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Ms. Keltch Green's ability to direct Z.G.'s education pertaining to religious questions and matters in a manner that emphasizes and instills her family's values, including their nonreligious values. She believes that her role, along with her husband, in directing Z.G.'s nonreligious upbringing and protecting Z.G.'s ability and freedom to develop individual beliefs on religious matters is one of the most important responsibilities she has as a parent. Imposing permanent, prominently placed displays of religious directives for nearly every hour that her child is in school, in accordance with S.B. 10, directly and substantially interferes with, burdens, and undermines Ms. Keltch Green's ability to raise her child in a nonreligious tradition.

*Plaintiffs Helen Hanks, Madison Hanks, and their minor child*

183.     Plaintiffs Helen Hanks and Madison Hanks are atheists. They are raising O.H. in a nonreligious tradition and household that gives O.H. space and autonomy to develop their own beliefs and views about religion. The Hanks are careful not to force their views onto O.H. They teach O.H. that religion is a personal matter, and that no one has the right to tell anyone else what

to believe or how to worship.

184.    As a result of S.B. 10's minimum requirements, O.H. cannot avoid the displays. O.H. is subjected to the displays, and will continue to be subjected to them, for nearly every hour of the school day.

185.    The Hanks family does not subscribe to the religious dictates of the Ten Commandments. On behalf of themselves and on behalf of O.H., they object to the school displays mandated by S.B. 10 because the displays promote and forcibly subject O.H. to religious scripture that the family does not believe in and that they do not teach O.H.

186.    The displays mandated by S.B. 10 substantially interfere with O.H.'s development when it comes to religious questions and matters and will threaten to undermine the beliefs, values, and practices pertaining to religious matters that the Hanks seek to instill in O.H. as part of their nonreligious household. Specifically, the displays send a message that Christianity is superior to other religions and that the government prioritizes Christian beliefs. This sends O.H. the message that O.H.'s opinions and beliefs are less valued than the beliefs of their Christian peers.

187.    In the past, O.H. has had significant negative experiences with adults, specifically adults in positions of authority, forcing their religious beliefs onto O.H. The displays mandated by S.B. 10 remind O.H. of these events, exacerbate painful memories, and cause O.H. to feel excluded. As a result, O.H. may feel pressure to suppress their atheist beliefs in school. The displays thus pressure O.H. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

188.    For the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden the Hank family's ability to direct O.H.'s education pertaining to religious

questions and matters in a manner that emphasizes and instills nonreligious values and a worldview that allows O.H. to form their own beliefs regarding questions of faith and morality.

*Plaintiff Kenneth Hayes and his minor children*

189.    Plaintiff Kenneth Hayes is an omnist and nonreligious. He is raising his children in a nonreligious tradition and household that gives them the space and autonomy to learn, explore, and develop their own beliefs and views about religion. As a parent, he teaches them to think critically, so that they can make choices for themselves that feel right for them in the future. Mr. Hayes's family does not observe or adhere to any single or specific religious text, practice, or ritual.

190.    Mr. Hayes's family does not subscribe to the religious dictates of the Ten Commandments. Therefore, on behalf of himself and on behalf of his children, he objects to the school displays mandated by S.B. 10 because the displays promote and forcibly subject his children to state-sponsored religious scripture that they do not believe in and that he does not teach them.

191.    The displays mandated by S.B. 10 substantially interfere with D.H.'s and S.H.'s development when it comes to religious questions and matters and threaten to undermine the beliefs, values, and practices pertaining to religious matters that Mr. Hayes seeks to instill in them as part of their nonreligious household. As a parent, Mr. Hayes teaches his children to question, explore, learn, and grow. He also instills in them to treat others with dignity and respect, and that liberty, love, and happiness are universal rights. Mr. Hayes wants his children to be free to explore various religions or no religion without pressure, especially from the government, to conform to any particular religion. He does not want the government to push any religion or religious morality on D.H. and S.H.

192.    By imposing the S.B. 10 displays on D.H. and S.H., the government is elevating one set of religious values and beliefs over their family's values, which are not based in religion.

193.    The displays required by S.B. 10 also send a confusing message to Mr. Hayes's children, who are neurodivergent, that the Ten Commandments are rules that they must follow because school is an institution of authority and that those who do not do so are "wrong" and outsiders in the school community. The displays thus pressure D.H. and S.H. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

194.    Further, Mr. Hayes finds the specific language of the state-mandated Ten Commandments in S.B. 10 objectionable. It uses terminology such as "manservant" and "maidservant," which suggests an endorsement of slavery and treating people as property. These undermine the values that Mr. Hayes and his spouse are instilling to D.H. and S.H.

195.    For the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Mr. Hayes's ability to direct D.H.'s and S.H.'s education pertaining to religious questions and matters in a manner that emphasizes and instills nonreligious values.

*Plaintiff Andrew Kirk and his minor child*

196.    Plaintiff Andrew Kirk is atheist, and he is raising his child in a nonreligious tradition and household that gives J.K. the freedom to explore J.K.'s own religious path. He does not observe or adhere to any religious text, practice, or ritual.

197.    Mr. Kirk does not subscribe to the religious dictates of the Ten Commandments. Therefore, on behalf of himself and his child, he objects to the school displays mandated by S.B. 10 because the displays promote and forcibly subject his child to religious scripture that he does not believe in and that he does not teach J.K.

198.    The displays mandated by S.B. 10 substantially interfere with J.K.'s development when it comes to religious questions and matters and threaten to undermine the beliefs, values, and practices pertaining to religious matters that Mr. Kirk seeks to instill in J.K. as part of his nonreligious household. Specifically, the displays impose on J.K. a set of religious values and beliefs that Mr. Kirk's family does not subscribe to and in place of his beliefs, which are not based in religion. Mr. Kirk wants his child to be free to explore various religions, or no religion, without pressure, especially from the government, to conform to any particular religion. Mr. Kirk does not want the government to push any religion or religious morality on J.K.

199.    By imposing the Ten Commandments on J.K. for nearly every hour of the school day, the displays required by S.B. 10 will also send a confusing message to J.K. that the Ten Commandments are rules that must be followed and that those who do not do so are "wrong," less worthy, and outsiders in the school community. Mr. Kirk is concerned that J.K. will view the displayed Ten Commandments as authoritative commands of the government. The displays will thus pressure J.K. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

200.    The displays are also likely to lead to peer-on-peer harassment, ostracism, and additional proselytization of J.K. because Mr. Kirk is not raising J.K. in a religious household. Mr. Kirk worries that displaying the Ten Commandments in J.K.'s classrooms will result in J.K.'s ostracization due to J.K.'s lack of religious beliefs. As a result, the displays also increase the pressure on J.K. to suppress expression of the family's nonreligious background and views at school, and to express beliefs that are contrary to the family's beliefs.

201.    Mr. Kirk finds the specific language of the state-mandated Ten Commandments in S.B. 10 objectionable. It includes topics, such as adultery and slavery, that Mr. Kirk does not wish

to be explained to J.K. by J.K.'s teachers, especially in a religious context, should J.K. or other students ask about them. Instead of bringing clarity to J.K. about issues of morality, the displays will only confuse J.K.

202.    Finally, for the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Mr. Kirk's ability to direct J.K.'s education pertaining to religious questions and matters in a manner that emphasizes and instills nonreligious values.

*Plaintiff Ann-Marie Lelek and her minor children*

203.    Plaintiff Ann-Marie Lelek is nonreligious and is raising her children in a nonreligious tradition and household that gives B.L. and A.L. the space and autonomy to develop their own beliefs and views about religion. The family does not observe or adhere to any religious text, practice, or ritual.

204.    Ms. Lelek does not subscribe to the religious dictates of the Ten Commandments. Therefore, on behalf of herself and on behalf of B.L and A.L., she objects to the school displays mandated by S.B. 10 because the displays promote and forcibly subject her children to religious scripture that the family does not believe in and that she does not teach B.L. and A.L.

205.    The displays mandated by S.B. 10 will substantially interfere with B.L. and A.L.'s development when it comes to religious questions and matters and will threaten to undermine the beliefs, values, and practices pertaining to religious matters that Ms. Lelek seeks to instill in B.L. and A.L. as part of their nonreligious household. Specifically, the displays impose on B.L and A.L. a set of religious values and beliefs that their family does not subscribe to in place of their beliefs, which are not based in religion. Ms. Lelek wants her children to be free to explore various religions or no religion without pressure, especially from the government, to conform to any particular

religion. She does not want the government to push any religion or religious morality on B.L and A.L.

206.    By imposing the Ten Commandments on B.L and A.L. for nearly every hour of the school day, the displays required by S.B. 10 also send a confusing message to them that the Ten Commandments are rules that they must follow and that those who do not do so are "wrong," less worthy, and outsiders in the school community. Ms. Lelek is concerned that B.L and A.L. will view the displayed Ten Commandments as authoritative commands of the government, particularly A.L. who is a rule follower and may interpret the posters as rules to follow. The displays thus pressure B.L and A.L. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

207.    The displays are also likely to lead to peer-on-peer harassment, ostracism, and additional proselytization of B.L. and A.L. because Ms. Lelek's family is not religious. Ms. Lelek worries that displaying the Ten Commandments in B.L. and A.L.'s classrooms will exacerbate these issues and that they will be ostracized for their lack of religious beliefs or pressured to venerate the Ten Commandments. Ms. Lelek believes as a result, the displays will pressure B.L and A.L. to suppress expression of their family's nonreligious background and views at school, and to express beliefs that are contrary to their family's beliefs.

208.    Ms. Lelek finds the specific language of the state-mandated Ten Commandments objectionable. It includes topics, such as adultery and slavery, that she believes are far too mature for B.L and A.L. Instead of bringing clarity to them about issues of morality, it will only confuse them.

209.    Finally, for the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Ms. Lelek's ability to direct B.L and A.L.'s education pertaining to religious questions and matters in a manner that emphasizes and instills nonreligious values.

*Plaintiff Joyce Masters and her minor child*

210.    Plaintiff Joyce Masters is Christian. Although she has chosen to share her faith with her child, she intentionally does not guide J.M. toward any particular belief system or religious practice. She believes that all people, including J.M., should have the freedom to develop their own beliefs and views about religion, without pressure from others. To allow her child the space to develop their own views and beliefs about religion, Mrs. Masters's family does not regularly observe or adhere to any religious text. J.M. is currently asking questions about religion and expressing a more agnostic viewpoint.

211.    Mrs. Masters's family does not subscribe to the religious dictates of the Ten Commandments. Therefore, on behalf of herself and her child, she objects to the school displays mandated by S.B. 10 because the displays promote and forcibly subject her child to religious scripture that she does not believe in and that she does not teach them.

212.    The displays mandated by S.B. 10 will substantially interfere with how Mrs. Masters's is directing her child's religious and moral development. She does not teach the Ten Commandments to her child. Therefore, she objects to the Ten Commandments posters required by S.B. 10 because the text includes religious directives that she does not want her child to feel bound by. For example, the displays direct, "I AM the LORD thy God" and "Thou shalt have no other gods before me." However, she teaches her child that it is okay if they become nonreligious or want to adhere to a non-Christian religion. She welcomes J.M. to explore their religious beliefs or lack thereof.

213.     Mrs. Masters is an active-duty member of the United States military, and she has dedicated her career to protecting American constitutional principles and she teaches her child American constitutional values. She objects to the state pushing one religion onto her child and leading them to believe that the United States Constitution supports such religious pressure.

214.     By imposing the Ten Commandments on Mrs. Masters's child for nearly every hour of the school day, the displays required by S.B. 10 will send a confusing and harmful message that the Ten Commandments are rules that must be followed and that those who do not follow the Ten Commandments are less worthy and outsiders in the school community. J.M. feels that the school is forcing a religious belief on them. J.M. is confused and frustrated that J.M.'s school is presenting a religious belief next to academic facts. S.B. 10's religious displays will pressure J.M. to observe, venerate, and adopt the state's preferred religious doctrine and practice.

215.     The displays will also threaten to undermine the beliefs, values, and practices pertaining to religious matters that Mrs. Masters seeks to instill in her child. As noted above, she believes that her child must be free to accept or reject any particular religion without pressure from her or other authority figures. She does not tell her child what to believe and nor should her child's school. However, the displays mandated by S.B. 10 will impose on J.M. one set of religious values and beliefs that is different from what she is teaching them. She does not want the government to push any particular religion or religious morality on J.M.

216.     The displays are also likely to lead to peer-on-peer harassment, ostracism, and social isolation of Mrs. Masters's child because they are not as traditionally religious as their peers. As explained above, J.M. is asking questions about religion and exploring whether they believe in any religion. However, to avoid social marginalization, J.M. will feel pressure to conform to and express a religious belief in the Ten Commandments and will avoid expressing J.M.'s interest in

other religions and agnostic or atheist identities. Furthermore, the Ten Commandments posters will be distressing and distracting for J.M., because J.M.'s class includes students of various religions and J.M. believes that the posters tell those students that they are "wrong" in their beliefs.

217.    The ability to guide her child's religious and moral development and to ensure that they are able to arrive at their faith beliefs, if any, of their own accord, without pressure from her and other authority figures, is a critical aspect of Mrs. Masters's religious belief and exercise as a Christian.

218.    Finally, for the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Mrs. Masters's ability to direct J.M.'s education pertaining to religious questions and matters in a manner that emphasizes and instills nonreligious values.

*Plaintiff Randy Myers and his minor children*

219.    Plaintiff Randy Myers is atheist. His family does not attend church. Mr. Myers is raising his children in a secular household that gives them the space and autonomy to develop their own beliefs and views about religion. The family sometimes discusses religion, particularly when Q.M. and M.M. have questions about religion. However, Mr. Myers's family does not regularly observe or adhere to any religious text, practice, or ritual nor have they discussed the Bible or the Ten Commandments with Q.M. and M.M prior to S.B. 10's passage.

220.    Mr. Myers's family does not subscribe to the religious dictates of the Ten Commandments. Therefore, on behalf of himself and his children, he objects to the school displays mandated by S.B. 10 because the displays promote and forcibly subject his children to religious scripture that his family does not believe in and that he does not teach them.

221.    The displays mandated by S.B. 10 substantially interfere with how Mr. Myers is directing Q.M.'s and M.M.'s religious and moral development. As their parent, he has chosen not

to teach the Ten Commandments in his house. He does not discuss with his children the idea of one specific "God" or "Lord" that they must believe in or adhere to the teachings of. He teaches his children that they should welcome all religions and that they are free to explore religion if they so choose. However, the state-mandated Ten Commandments displays dictate to his children that "I AM the LORD thy God" and "Thou shalt have no other gods before me." Q.M. and M.M. believe that what they are taught at school is true and understand a poster on the wall as part of what school is teaching them. Q.M. has already begun to question the truth of what they teach Q.M. at home. Therefore, the displays impose on Mr. Myers's children one set of religious values and beliefs over their family's values, which are not based in religion. The displays thus undermine the beliefs, values, and practices pertaining to religious matters that he seeks to instill in his children as part of their secular household. He does not want the government to push any particular religion or religious morality on his children.

222.    By imposing the Ten Commandments on Mr. Myers's children for nearly every hour of the school day, the displays required by S.B. 10 also send a confusing and harmful message that the Ten Commandments are rules that must be followed and that those who do not follow the Ten Commandments are less worthy and outsiders in the school community. Q.M. has existing anxieties about not being religious like their peers. Recently, Q.M. came home from school asking if they would go to "Hell" because they are not religious. Q.M. and M.M. have expressed their concern about the Ten Commandments displays. Q.M. has asked Mr. Myers why the Ten Commandments are on the classroom walls and what it means. Q.M. worries that they are doing something wrong if they do not believe in the Ten Commandments as a religious matter. Thus, S.B. 10's religious displays pressure his children to observe, venerate, and adopt the state's preferred religious doctrine.

223.    The displays are also likely to lead to peer-on-peer harassment, ostracism, and social isolation of Mr. Myers's children because their family is not religious. Q.M. has already experienced negative reactions when Q.M. shares that their family is not religious. The Ten Commandments displays make religion a central part of the classroom and students' conversations. Recently, Q.M. brought up the Ten Commandments displays in conversation with their friends and said that their family does not support the displays being posted in the classroom. Q.M.'s friends then asked them if they believe in God and Q.M. said no. Q.M.'s friends reacted poorly to Q.M.'s lack of religious belief. Now, in order to fit in with Q.M.'s classmates, Q.M. avoids expressing their family's beliefs at school and feels pressure to express a religious belief in the Ten Commandments.

224.    Further, Mr. Myers finds the specific language of the state-mandated Ten Commandments to be objectionable. It includes topics, such as adultery and coveting "thy neighbor's wife," that are not appropriate for Q.M and M.M. Mr. Myers believes that these concepts are far too mature for his children's ages. He does not want his children to read these statements before he chooses to introduce them to these topics. Instead of bringing clarity to them about issues of morality, the displays will only confuse them.

225.    Finally, for the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Mr. Myers's ability to direct Q.M.'s and M.M.'s religious education and development in a manner that emphasizes and instills secular values and a worldview that allows his children to form their own beliefs regarding questions of faith and morality.

*Plaintiffs Jessica Salyers, Joshua Salyers, and their minor child*

226.    Plaintiffs Jessica Salyers and Joshua Salyers are atheists. They are deliberately raising M.S. in a non-religious household that gives M.S. the space and autonomy to develop their

own beliefs and views about religion. The Salyers strive to raise M.S. with strong moral values, but they do not teach those values in conjunction with a particular faith system.

227.    On behalf of themselves and on behalf of M.S., the Salyers object to the school displays mandated by S.B. 10. These displays promote and forcibly subject M.S. to religious scripture that their family does not believe in and that they do not teach M.S.

228.    Further, the S.B. 10 displays include topics, such as "covet[ing] thy neighbor's wife," or "adultery," that the Salyers do not think are appropriate to discuss in the classroom. They do not want M.S.'s teachers explaining these topics to M.S., especially if introduced in the context of religious doctrine.

229.    The displays also threaten to undermine the beliefs, values, and practices pertaining to religious matters that the Salyers seek to instill in their child. Certain language and commandments in the displays conflict with the values that the Salyers are teaching M.S. at home. For example, they teach M.S. that respect must be earned by good behavior and not automatically given to someone—even a parent—who treats one poorly. As a result, they believe that the direction to "honor thy father and thy mother" requires additional discussion that is not appropriate at school because it is in the context of religious doctrine. Similarly, they object to the use of terms like "maidservant" and "manservant" because they imply that people are objects that can be owned, which is contrary to the values that the Salyers are instilling in their child. The displays mandated by S.B. 10 impose on M.S. one set of religious values and beliefs that is different from what the Salyers are teaching M.S. The Salyers do not want the government to push any particular religion or religious morality on M.S.

230.    With the Ten Commandments posted in every classroom, the Salyers believe that M.S. will perceive them as rules that must be followed by everyone at all times. M.S. is on the

autism spectrum and has been diagnosed with ADHD. As a result, M.S. is a rule follower and tends to take instructions very literally. If M.S. sees someone who is breaking the rules, M.S. feels the need to speak up to tell them they are wrong.

231.    In the past, M.S. has had trouble understanding that there are different rules that apply at home and at school, and the Salyers believe M.S. will have challenges understanding that the Ten Commandments are not rules that the Salyers follow in their family. For example, the Salyers do not believe in God or observe the Sabbath. They are concerned that this conflict between the "rules" that M.S. sees at school and their family's conduct will confuse and distress M.S.

232.    By conveying that the Ten Commandments are authoritative rules to be followed, the displays will pressure M.S. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine. The displays will also send a harmful message to M.S. that M.S. is an outsider because their family is not Christian. As a result, the Salyers are afraid that M.S. will be bullied or ostracized by their peers, and M.S. may suppress their family's nonreligious background and views at school.

233.    For the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden the Salyers' ability to direct M.S.'s religious education and development in a manner that emphasizes and instills secular values and a worldview that allows M.S. to form their own beliefs regarding questions of faith and morality.

## CLASS ALLEGATIONS

### Plaintiff Class

234.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and their minor children and a statewide class consisting of all parents, legal

guardians, and their minor children suffering from constitutional harms as a result of Defendants'

posting of religious displays as required by S.B. 10 (collectively, the "Plaintiff Class").

235.    The Plaintiff Class alleges violations of the Establishment Clause and the Free

Exercise Clause, and is defined as follows:

> All students enrolled in a Texas ISD that is subject to S.B. 10, and their parents or legal
> guardians. Excluded from the class are students, and the parents or guardians of such
> students, enrolled in: (i) a Texas ISD that is subject to Court Orders enjoining the posting
> of the Ten Commandments, or (ii) a Texas ISD subject to S.B. 10 related litigation initiated
> by the Attorney General of Texas prior to the filing of this litigation.

236.    The Plaintiff Class is so numerous that joinder of all members is impracticable and

includes millions of parents and their minor children who are subjected to these unconstitutional

displays. Given that there are approximately 5.5 million students enrolled in Texas public

schools,[21] joinder of all class members is plainly "impracticable" and the numerosity requirement

is easily met. As of the date of this filing, Restore American Schools reported that over 4,211

schools in Texas have complied with S.B. 10, and an estimated 182,310 classrooms and 3,445,659

students have been subjected to the posters.[22]

237.    Other factors include geographical dispersion of the class, the ease with which class

members may be identified, and the nature of the action. Students routinely enroll in Texas ISDs,

and they are spread out across the state, rendering joinder impracticable. Additionally, certification

would advance judicial economy by obviating the need for a multiplicity of actions.

---

[21] Texas Education Agency (Div. of Research and Analysis), *Enrollment in Texas Public
Schools    2023-2024*    (August    2024),    https://tea.texas.gov/reports-and-data/school-
performance/accountability-research/enrollment-trends (last visited Oct. 23, 2025).

[22] Restore American Schools, *Help Return the Ten Commandments to Classrooms and
Defend Our History* (last updated Dec. 2, 2025), https://restoreamericanschools.com/ (last visited
Dec. 2, 2025).

238.    The representative Plaintiffs share common questions of fact and law with the putative class members, including whether S.B. 10—which mandates the display of a Protestant version of the Ten Commandments in every public-school classroom in Texas—constitutes an unconstitutional establishment of religion. Similarly, with respect to the Free Exercise Clause, common issues include whether S.B. 10 is religiously neutral, and if not, whether the imposition of scripture on public-school students for nearly every second they are in school can satisfy strict scrutiny.

239.    Plaintiffs' claims are typical of the claims of the Plaintiff Class. The representative Plaintiffs' claims have the same essential characteristics as those of the putative Plaintiff Class. This complaint alleges a facial challenge to a state law that imposes uniform, strict, and extensive requirements for compliance upon every Texas school district. The representative Plaintiffs' claims, if successful, will advance their rights and those of the absent class members equally by enjoining school districts statewide from complying with S.B. 10. Further, Plaintiffs' claims all rely upon an identical set of facts, *i.e.*, the enactment of and compliance with S.B. 10. Therefore, the experiences of the putative class representatives exemplify the typical way in which the First Amendment violations resulting from S.B. 10 harm members of the Plaintiff Class.

240.    The representatives of the Plaintiff Class are willing and able to fulfill their obligations as class representatives and have the support of counsel with significant experience in litigating complex civil rights actions like this one. The representative Plaintiffs have agreed to act as representatives for their class; they can demonstrate familiarity with the complaint, the concept of a class action, and the constitutional protections they seek to vindicate; they are prepared to respond to reasonable discovery requests in this case; and they are dedicated to fulfilling the role and duties of a class representative protecting class members' fundamental constitutional rights.

241.    Counsel for the Plaintiffs are presently unaware of any conflicts between the representative Plaintiffs and the putative class members and any conflicts would be incidental to the questions presented by this lawsuit.

242.    Further, Plaintiffs' counsel are competent and zealous. Indeed, Plaintiffs' counsel team includes attorneys who are representing plaintiffs in two separate lawsuits challenging the constitutionality of S.B. 10 and two other lawsuits challenging state laws similar to S.B. 10. Many members of Plaintiffs' legal team also have extensive experience litigating complex class action cases and civil rights cases more generally. And as illustrated by the representation of 48 client families across four other cases in three different states, Plaintiffs' counsel are willing to devote substantial resources to defending public-school families' First Amendment rights. In sum, Plaintiffs' counsel is well-suited to be class counsel in this case, and they respectfully request appointment as class counsel.

243.    The putative class members are subject to the same or similar constitutional harms. The state enacted a law that requires public school districts to display the Ten Commandments in every public-school classroom without exception. Because Defendants acted on grounds that apply generally to the Plaintiff Class, final injunctive relief or corresponding declaratory relief sought by Plaintiffs is appropriate respecting the class as a whole. The Plaintiff Class seeks only attorneys' fees, costs, and injunctive and declaratory relief. Accordingly, the Plaintiff Class is superior to other available methods for the fair and efficient adjudication of this controversy.

**Defendant Class**

244.     The putative Plaintiff Class brings this action against all Defendants, including all the individually named Defendants, and the putative members of the "Defendant Class" defined as follows:

> All Texas ISDs that are subject to S.B. 10. Excluded from the class are: (i) Texas ISDs that are subject to Court Orders enjoining the posting of the Ten Commandment displays, and (ii) Texas ISDs subject to S.B. 10 related litigation initiated by the Attorney General of Texas prior to the filing of this litigation.

245.     This lawsuit is properly maintained as an action against the putative Defendant Class under Federal Rule of Civil Procedure 23.

246.     Joinder is impracticable here. There are over 1,000 school districts spread out across the State of Texas. Certifying a defendant class will conserve resources for all parties involved and promote judicial efficiency.

247.     The representatives of the Defendant Class have the same interests as the putative Defendant Class members, all of which are similarly situated, and are acting (or will act) in the same manner with respect to the Plaintiff Class. Plaintiffs' claims against the Defendants, and the Defendants' anticipated defenses, are typical of the claims and anticipated defenses of each putative member of the defendant class because they all arise from the same nucleus of operative facts centered on compliance with S.B. 10.

248.     The representatives of the Defendant Class sit in an identical position to that of the absent class members and are adequate class representatives. On its face, S.B. 10 applies to *all* public-school districts in Texas, and Texas state law requires all school districts to comply with statutory obligations like those imposed by S.B. 10. Tex. Fam. Code § 65.003; Tex. Educ. Code §§ 25.0915; 25.093. Accordingly, the interest in complying with S.B. 10 is shared across the class.

249.    The Defendant Class will likely be represented in this matter by the Texas Attorney General consistent with the dictates of S.B. 10, satisfying the vigorous prosecution requirement. *See* S.B. 10 § 1(g) ("The attorney general shall defend a public elementary or secondary school in a cause of action relating to any claims arising out of a school's compliance with this section."). Counsel from the Attorney General's office has represented 21 school districts in the *Nathan* and *Cribbs Ringer* litigation and is perfectly suited to continue representing the interests of the State and school districts that make up the Defendant Class in the same way in this matter.

250.    If Plaintiffs are compelled to pursue relief in multiple counties—or even federal districts—across Texas, the same core facts and legal theories could yield divergent outcomes, on different timelines, resulting in both confusion among defendants and a needlessly increased risk that members of the Plaintiff Class will suffer violations of their constitutional rights. Indeed, the Attorney General's recent decision to sue Galveston ISD, Round Rock ISD, and Leander ISD to enforce S.B. 10 in state court highlights the differing obligations that may be thrust upon members of the Defendant Class, and members of the Plaintiff Class and the Defendant Class alike could thus be subject to varying legal standards solely based on where they happen to file.

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

251.    Plaintiffs re-allege and incorporate by reference all the above paragraphs as if they were fully set forth herein.

252.    The Establishment Clause of the First Amendment to the United States Constitution guarantees that "Congress shall make no law respecting an establishment of religion."

253. In *Stone v. Graham*, the Supreme Court struck down a statute similar to S.B. 10, holding that posting the Ten Commandments in public-school classrooms violates the Establishment Clause. 449 U.S. at 41-43. *Stone* remains binding precedent, and S.B. 10 is thus unconstitutional. *See, e.g.*, *Nathan*, 2025 WL 2417589, at *28; Order, *Cribbs Ringer*, No. 25-cv-01181, ECF No. 68 at 10-11.

254. By mandating that a state-sanctioned version of the Ten Commandments be displayed in every public elementary and secondary school classroom in Texas, S.B. 10 impermissibly prefers a set of distinct religious beliefs and dictates and will impose those preferred religious beliefs and dictates on Texas's public-school children, including the minor-child Plaintiffs.

255. As a result of the Ten Commandments displays mandated by S.B. 10, Texas students—including the minor-child Plaintiffs—will be unconstitutionally coerced into religious observance, meditation on, veneration, and adoption of the state's favored religious scripture, and they will be pressured to suppress expression of their personal religious and nonreligious beliefs and practices, especially in school, to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers.

256. In addition, by mandating that a Protestant version of the Ten Commandments be displayed in every public elementary and secondary school classroom and prescribing an official religious text for schoolchildren to venerate, S.B. 10 adopts an official position on religious matters, violating the Establishment Clause's prohibition against taking sides in questions over theological doctrine and violating the "clearest command" of the Establishment Clause that "the government may not 'officially prefe[r]' one religious denomination over another." *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 145 S. Ct. 1583, 1591 (2025) (quoting

*Larson v. Valente*, 456 U.S. 228, 244 (1982) (alteration in original)). The Act's mandatory, religiously preferential displays will not further a compelling governmental interest and, even if they did, they are not narrowly tailored to any such interest under the Establishment Clause.

257.    There is no longstanding historical practice or tradition of prominently and permanently displaying any version of the Ten Commandments in public-school classrooms. On the contrary, the Supreme Court unambiguously held in *Stone* that such a practice is proscribed by the Constitution.

258.    By complying with S.B. 10, Defendants, under the color of state law, will unavoidably violate Plaintiffs' rights under the Establishment Clause of the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, and under 42 U.S.C. § 1983.

259.    Plaintiffs have no adequate remedy at law for the denial of their fundamental Establishment Clause rights.

## COUNT II

### VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

260.    Plaintiffs re-allege and incorporate by reference all the above paragraphs as if they were fully set forth herein.

261.    The Free Exercise Clause of the First Amendment to the United States Constitution guarantees that "Congress shall make no law . . . prohibiting the free exercise [of religion]."

262.    The displays mandated by S.B. 10 will burden the religious exercise of the minor-child Plaintiffs by pressuring them into observance, meditation on, veneration, and adoption of the state's favored religious scripture—in violation of their own religious or nonreligious beliefs—to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers.

The displays will also pressure the minor-child Plaintiffs to suppress or limit expression of their religious or nonreligious backgrounds, beliefs, or practices while in school to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers.

263.    The displays mandated by S.B. 10. will burden the religious exercise of the parent-Plaintiffs by usurping their authority to direct their children's religious education and religious or nonreligious upbringing.

264.    Under the Free Exercise Clause, when the government burdens religious exercise pursuant to a policy that is not religiously neutral, courts will find a constitutional violation "unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy*, 597 U.S. at 525. The displays required under S.B. 10 are not neutral with respect to religion. By design, the Act mandates the display of expressly religious scripture, the Ten Commandments, in every public-school classroom and, moreover, requires that a specific Protestant version of that scripture be used.

265.    Further, under the Free Exercise Clause, a public school "burdens the religious exercise of parents" where, as here, "it requires them to submit their children to instruction that poses a very real threat of undermining the religious beliefs and practices that the parents wish to instill." *Mahmoud*, 145 S. Ct. at 2342 (cleaned up). Given the nature of this burden, courts "need not ask whether the law at issue is neutral or generally applicable before proceeding to strict scrutiny." *Id.* at 2361.

266.    The displays mandated by S.B. 10 will not further a compelling governmental interest and, even if they did, they are not narrowly tailored to any such interest under the Free Exercise Clause.

267.    By complying with S.B. 10, Defendants, under the color of state law, will unavoidably violate Plaintiffs' rights under the Free Exercise Clause of the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, and under 42 U.S.C. § 1983.

268.    Plaintiffs have no adequate remedy at law for the denial of their fundamental Free Exercise Clause rights.

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request the following relief:

A.    Provisional and final certification of the classes as defined in paragraphs 235 and 244.

B.    An order declaring that S.B. 10 violates the Establishment Clause and Free Exercise Clause of the First Amendment to the United States Constitution;

C.    A temporary restraining order and an order preliminarily and, thereafter, permanently enjoining the Defendant School Districts and all members of the putative Defendant Class, and their officers, agents, affiliates, subsidiaries, employees, successors, and all other persons or entities in active concert or privity or participation with them, from complying with S.B. 10 by displaying the Ten Commandments in public elementary and secondary school classrooms;

D.    To the extent that any Defendant School Districts or any members of the putative Defendant Class have already displayed the Ten Commandments in public-school classrooms pursuant to S.B. 10, a temporary restraining order and an order preliminarily and, thereafter, permanently requiring such Defendants and their officers, agents, affiliates,

subsidiaries, employees, successors, and all other persons or entities in active concert or privity or participation with them, to remove such displays;

        E.     An award, from Defendants to Plaintiffs, of reasonable attorneys' fees and costs incurred in connection with this action, pursuant to 42 U.S.C. § 1988;

        F.     An order retaining this Court's jurisdiction of this matter to enforce the terms of the Court's order; and

        G.     Such other relief as the Court deems just and proper.

Date: December 2, 2025

Respectfully submitted,

By: */s/ Jonathan K. Youngwood*
SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood
Janet A. Gochman*
Noah Gimbel*
Jordan T. Krieger*
Avia Gridi*
Griselda Cabrera*
Nicolas Lussier*
Victoria Wang*
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
*jyoungwood@stblaw.com*
*jgochman@stblaw.com*
*noah.gimbel@stblaw.com*
*jordan.krieger@stblaw.com*
*avia.gridi@stblaw.com*
*griselda.cabrera@stblaw.com*
*nicolas.lussier@stblaw.com*
*victoria.wang@stblaw.com*

AMERICAN CIVIL LIBERTIES UNION
OF TEXAS FOUNDATION, INC.
Adriana Piñon
Thomas Buser-Clancy
Sarah Corning
Chloe Kempf

P.O. Box 8306
Houston, TX 77288
(713) 942-8146
*apinon@aclutx.org*
*tbuser-clancy@aclutx.org*
*scorning@aclutx.org*
*ckempf@aclutx.org*

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
Daniel Mach*
915 15th Street, NW, Suite 600
Washington, DC 20005
(202) 675-2330
*dmach@aclu.org*

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
Arijeet Sensharma*
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
*cl_asensharma@aclu.org*

AMERICANS UNITED FOR
SEPARATION OF CHURCH & STATE
Alex J. Luchenitser*
Amy Tai*^
Jess Zalph*
Alexandra Zaretsky*
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7306
*luchenitser@au.org*
*tai@au.org*
*zalph@au.org*
*zaretsky@au.org*

FREEDOM FROM RELIGION
FOUNDATION
Patrick C. Elliott
Samuel T. Grover
Nancy A. Noet*
P.O. Box 750
Madison, WI 53701
(608) 256-8900

*patrick@ffrf.org*
*sgrover@ffrf.org*
*noetn@ffrf.org*

*Counsel for Plaintiffs*

\* Motion for *Pro Hac Vice* Admission
Forthcoming

^ Admitted to practice in New York; not a
member of the D.C. Bar.